## MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY

v.

### David A. JEFFERSON.

Court of Appeals of Tennessee,
at Nashville.

Feb. 2, 1999 Session.

Sept. 5, 2002.

Permission to Appeal Denied by Supreme Court Jan. 27, 2003.

Rehearing Denied March 10, 2003.

Thomas H. Bilbrey, Lafayette, Tennessee, for appellant, David A. Jefferson.

Tyree B. Harris, IV and Lisa Ramsay Cole, Nashville, Tennessee, for appellee, Massachusetts Mutual Life Insurance Company.

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and WILLIAM B. CAIN, J., joined.

## OPINION

This appeal involves a clinical psychologist who lost his professional license following a sexual affair with a former patient. Five months after the Board of Examiners in Psychology revoked his license, the psychologist filed a claim with his disability insurance carrier asserting that depression had prompted him to have the affair and had also rendered him unable to practice psychology. The insurance company denied coverage and filed a declaratory judgment action in the Circuit Court for Sumner County seeking to establish its obligations under the psychologist's policy. Following a bench tri-

al, the court determined that the psychologist has failed to demonstrate that he was disabled within the meaning of the policy. On this appeal, the psychologist asserts that he is entitled to disability benefits, and the insurance company insists that it was entitled to discretionary costs under Tenn. R. Civ. P. 54.04(2). We concur with the trial court's conclusion that the psychologist has not demonstrated that he is entitled to benefits under his disability policy. We also find that the insurance company was entitled to recover part of its requested discretionary costs.

## I.

David A. Jefferson obtained a doctorate in clinical psychology and acquired a license to practice psychology in Tennessee in 1977. He and his family moved to Sumner County where he established a flourishing private practice in Hendersonville. In 1984, Dr. Jefferson began treating Jane Roe [1] for panic attacks and depression. Ms. Roe's panic attacks eventually subsided, and Dr. Jefferson discontinued her therapy in August 1987. However, Dr. Jefferson and Ms. Roe continued to see each other on a personal basis. Even though both of them were married, they began having a sexual relationship in October 1987.[2] Their affair ended in February 1989 after Dr. Jefferson started an affair with another woman. Ms. Roe retaliated by telephoning Dr. Jefferson's wife and children to tell them about her relationship with Dr. Jefferson and by filing a complaint with the Board of Examiners in Psychology ("licensing board").[3]

In May 1989, Dr. Jefferson sought therapy from Dr. Wayne C. Richard, another clinical psychologist. Dr. Richard determined that "various stressors" had rendered Dr. Jefferson "somewhat dysfunctional" in his professional and home life.[4] In July 1989, the licensing board filed a formal notice of charges against Dr. Jefferson based on Ms. Roe's complaint. Dr. Jefferson responded to these charges by asserting that he was "a highly qualified and competent psychologist" and that "there was no ethical rule ... which prohibited social or romantic relationships between psychologists and their former patients." Following a hearing on April 26 and 27, 1990, the licensing board entered an order on May 15, 1990, finding that Dr. Jefferson had "engaged in improper sexual contact and sexual intercourse with ... [an] individual who had recently completed a course of psychotherapy and was still under the influence of that powerful rela-

---

1. Ms. Roe's identity is not relevant to the issues in this case.

2. This liaison was apparently not Dr. Jefferson's first sexual relationship with a patient. *Roe v. Jefferson*, 875 S.W.2d 653, 654 (Tenn. 1994) (noting that Dr. Jefferson told Ms. Roe in early 1988 that he was being investigated for potential ethical violations stemming from an affair with a former patient in 1979). The Board of Examiners of Psychology eventually directed Dr. Jefferson to conduct research and write four papers addressing intimate relationships with former patients. Dr. Jefferson later confided to another clinical psychologist that he had had affairs with four former patients.

3. Ms. Roe also filed a medical malpractice case against Dr. Jefferson on February 23, 1990, which was subsequently dismissed as untimely. *Roe v. Jefferson*, 875 S.W.2d 653 (Tenn.1994).

4. Dr. Jefferson later identified these "stressors" as (1) his marital problems, (2) his difficulties with a daughter over a boyfriend, (3) the stress of dealing with patients, (4) his long-standing difficulties with his father, (5) his extramarital affairs, and (6) the threat of disciplinary proceedings.

tionship" and that he had "used said individual to fulfill his needs and exploited said individual." Accordingly, the licensing board permanently revoked Dr. Jefferson's license to practice psychology in Tennessee.

Dr. Jefferson promptly filed a petition for reconsideration and a motion for a stay of the licensing board's May 15, 1990 order. Less than one month later, he consulted with a physician friend, Dr. William E. Hardin, about "going on disability because of depression." On October 1, 1990, Dr. Jefferson filled out a claim form seeking benefits under his Disability Income Policy issued by Massachusetts Mutual Life Insurance Company ("Massachusetts Mutual"). He described his sickness as "major depression following revocation of license" and stated that he had been totally disabled since April 29, 1990 and that he had been receiving treatment from Dr. Hardin since June 12, 1990.

On December 14, 1990, the licensing board heard argument on Dr. Jefferson's petition for reconsideration and motion for stay. Approximately one month later, on January 24, 1991, Massachusetts Mutual denied Dr. Jefferson's claim for disability benefits. Thereafter, on February 5, 1991, the licensing board denied his motions to reconsider and to stay its order. Dr. Jefferson then filed an untimely, pro se petition for reconsideration of the board's February 5, 1991 order asserting, among other things, that "I am so rehabilitated that it is almost beyond description." When the licensing board did not act on his petition, Dr. Jefferson sought judicial review of the board's decision in the Chancery Court for Davidson County.

In June 1991, Massachusetts Mutual filed a declaratory judgment action in the Circuit Court for Sumner County to ascertain its rights and obligations under Dr. Jefferson's disability insurance policy. It asserted that Dr. Jefferson's claimed disability was the result of his own voluntary acts rather than a debilitating sickness or injury. After taking proof on October 31 and November 5, 1996, the trial court entered its judgment on February 3, 1997, concluding that Dr. Jefferson "was not entitled to any benefits under the policy of disability insurance in question ... having failed to demonstrate that he was unable to work as the direct and proximate result of a compensable disability and did not demonstrate a loss of income of at least twenty percent (20%) as the direct and proximate result of a disability...." Dr. Jefferson filed a timely Tenn. R. Civ. P. 59.04 motion, and Massachusetts Mutual moved for its discretionary costs under Tenn. R. Civ. P. 54.04(2).

On December 4, 1997, while the parties' post-trial motions were pending, the Chancery Court for Davidson County filed its memorandum and order in the proceeding to review the licensing board's revocation of Dr. Jefferson's license. The chancery court determined that the licensing board erred by finding that Dr. Jefferson had violated the ethical prohibition against client-therapist relationships. However, it found the evidence supported the board's findings that Ms. Roe was still under Dr. Jefferson's influence and that he had exploited their relationship to fulfill his own needs. Accordingly, the chancery court upheld the licensing board's determination that Dr. Jefferson was guilty of repeated negligence in the course of his practice. The chancery court also reduced Dr. Jefferson's punishment from a permanent revocation to an eight-year suspension ending on May 15, 1998. The court conditioned the reinstatement of Dr. Jefferson's license on the licensing board's imposition of reasonable conditions to assure that his negligent behavior did not reoccur.[5]

**5.** *Jefferson v. Board of Examiners in Psycholo-* gy, No. 91–1076–II (Davidson Ch. December

The chancery court's decision prompted Dr. Jefferson to file an amended Tenn. R. Civ. P. 59.04 motion in this proceeding. On January 13, 1998, the trial court filed an order denying Dr. Jefferson's Tenn. R. Civ. P. 59.04 motion and Massachusetts Mutual's motion for discretionary costs. Dr. Jefferson perfected this appeal. He now argues that the trial court misconstrued the terms of his disability policy and "did not properly weigh the evidence." Massachusetts Mutual asserts that the trial court properly determined that Dr. Jefferson was not entitled to benefits under his disability policy but that the trial court erred by denying its motion for discretionary costs.

## II.

### DR. JEFFERSON'S DISABILITY INCOME POLICY

This appeal requires that we first scrutinize Dr. Jefferson's disability policy because both his rights and Massachusetts Mutual's obligations are governed by the terms of their contract of insurance. *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d 142, 148 (Tenn.Ct.App.2001). In this case, the contract of insurance is found in the policy itself "which includes any attached papers and endorsements." [6]

■ Insurance policies are subject to the same rules and principles that are used to construe other contracts. *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d 811, 814 (Tenn.2000); *Williams v. Berube & Assocs.*, 26 S.W.3d 640, 643 (Tenn.Ct.App.2000). The courts' role is to give effect to the parties' intentions as reflected in their written contract of insur-

ance. *Harrell v. Minnesota Mut. Life Ins. Co.*, 937 S.W.2d 809, 814 (Tenn.1996); *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn.Ct.App.2000). Accordingly, when the provisions of an insurance policy are clear and unambiguous, our construction of the policy should favor neither party, *Brown v. Tennessee Auto. Ins. Co.*, 192 Tenn. 60, 63, 237 S.W.2d 553, 554 (1951); *Victoria Ins. Co. v. Hawkins*, 31 S.W.3d 578, 580 (Tenn.Ct.App.2000), and should avoid artificially narrowing the policy's coverage or extending coverage beyond the policy's intended scope. *Merrimack Mut. Fire Ins. Co. v. Batts*, 59 S.W.3d at 148.

■ An insurance policy should be construed fairly and reasonably. *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d at 730–31; *Black v. Aetna Ins. Co.*, 909 S.W.2d 1, 3 (Tenn.Ct.App.1995). It should also be construed as a whole, *English v. Virginia Sur. Co.*, 196 Tenn. 426, 430, 268 S.W.2d 338, 340 (1954), and its language should be taken and understood in its plain, ordinary, and popular sense. *American Justice Ins. Reciprocal v. Hutchison*, 15 S.W.3d at 814; *Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195, 200 (Tenn.2000). When coverage questions arise, the courts should consider the components of an insurance policy in the following order: (1) the declarations, (2) the insuring agreements and definitions, (3) the exclusions, (4) the conditions, and (5) the endorsements. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d 1, 7 (Tenn.Ct.App.1998). The insuring agreement defines the outer limits of an insurance policy's coverage. Thus, if coverage

---

4, 1997). Apparently, the licensing board did not appeal the chancery court's decision.

**6.** The policy itself recites that "[t]his policy is a legal contract between the Owner and us. The entire contract consists of the policy, which includes any attached papers and en-

dorsements." Accordingly, the trial court correctly determined that the promotional materials Dr. Jefferson received from Massachusetts Mutual prior to applying for insurance were not part of the insurance contract.

cannot be found in the insuring agreement, it cannot be found elsewhere in the policy. *Merrimack Mut. Fire Ins. Co. v. Batts,* 59 S.W.3d at 148.

The insuring agreement in Dr. Jefferson's disability policy appears under the heading "Income Benefit." It states quite succinctly that "[w]e will pay a monthly income for each month that the Insured is disabled beyond the end of the Waiting Period." The significant terms in this sentence, "monthly income," "disabled," and "waiting period," are defined elsewhere in the policy.

For our purposes, the term most relevant to this appeal is "disabled" because an insured is not entitled to a monthly income payment for any month in which he or she is not disabled. The term "disability" is defined in the policy's definition section as

an incapacity of the Insured which:

- Is due to sickness or injury; and
- Begins while this policy is in force; and
- Requires care by or at the direction of a legally qualified physician (this physician must be someone other than the Insured or a member of the Insured's immediate family); and
- Reduces the Insured's ability to work; and
- Causes a Loss of Earned Income, as discussed in this Part.

The repeated use of the coordinating conjunction "and" at the conclusion of the separate clauses limiting the scope of the term "incapacity" signals that an incapacity must be consistent with each of the five limitations before it can be considered a disability for the purposes of Dr. Jeffer-

son's policy. *See Sherman v. Reserve Ins. Co.,* 350 So.2d 349, 352 (Fla.Dist.Ct.App. 1977); *Casteel v. Iowa Dep't of Transp.,* 395 N.W.2d 896, 898 (Iowa 1986); *see also Black's Law Dictionary* 86 (6th ed.1990) (defining "and" as a "conjunction connecting words or phrases expressing the idea that the latter is to be added to or taken along with the first").

The policy further defines several of the key terms found in the clauses limiting the types of incapacity that will render a person disabled. A disability due to sickness is a "disability which results from, or is contributed to by, illness, disease or bodily or mental infirmity." A disability due to injury is a "disability which results from accidental bodily injury to the Insured and which is not contributed to by illness, disease or bodily or mental infirmity."

Not all persons who become ill or who are injured are entitled to disability benefits under Dr. Jefferson's policy. In light of the policy's definition of "disability," a person whose ability to work has been reduced because of a sickness or injury is not entitled to monthly income payments unless the sickness or injury has also caused a "Loss of Earned Income." The policy defines and explains the computation of the "Loss of Earned Income." It is essentially a monthly computation of the difference between (1) the monthly average of the insured's earned income before the sickness or injury [7] and (2) the amount of income the insured actually earns during a particular month following the illness or injury. However, before an insured is entitled to disability benefits for a particular month, the policy requires that his or her Loss of Earned Income for that month be at least 20% of his or her average pre-

---

7. For the purposes of establishing the monthly average of an insured's income before the disability began, the policy selects the higher of (1) the average of the insured's income for the twelve months before the disability began or (2) the average of the insured's highest income for any consecutive 24 month period during the five years before the disability began.

disability income.[8] In simple terms, an insured is not entitled to a monthly disability payment unless his or her earned income for that month is at least 20% less than his pre-disability average earned income.[9]

## III.

### DR. JEFFERSON'S DISABILITY CLAIM

■ We now turn to Dr. Jefferson's disability claim. As the person seeking benefits, Dr. Jefferson had the burden of establishing that he had become incapacitated and that he was entitled to benefits under his disability policy. While the basis for Dr. Jefferson's claim changed over time, the trial court concluded that his "incapacity" beginning on April 29, 1990, was not caused by a disability due to sickness and that this incapacity had not resulted in a Loss of Earned Income. We agree.

### A.

■ Dr. Jefferson's disability claim must be analyzed using one of the most basic principles of insurance law. This principle is that the insured has the burden of demonstrating that a covered loss

has occurred.[10] *Pitman v. Blue Cross Blue Shield*, 217 F.3d 1291, 1298 (10th Cir.2000); *Blaine Constr. Corp. v. Insurance Co. of N. Am.*, 171 F.3d 343, 349 (6th Cir.1999) (construing Tennessee law); *Prudential Ins. Co. v. Davis*, 18 Tenn.App. 413, 436, 78 S.W.2d 358, 372 (1934) (holding that a person claiming total permanent disability insurance benefits had the burden of proving that his disability was both total and permanent); *see also* 20 John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 11376 (1980). This rule applies to disability claims. *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 494 (D.C.Cir.1998); *Abnathya v. Hoffmann-LaRoche, Inc.*, 2 F.3d 40, 46 (3d Cir.1993); *Zenk v. Paul Revere Life Ins. Co.*, 171 F.Supp.2d 929, 933 (D.Minn.2000). Accordingly, from the outset of his claim, Dr. Jefferson had the burden of establishing that he had been disabled by an incapacity that satisfied his disability policy's five requirements.

### B.

In his "Statement of Claimant" dated October 1, 1990, Dr. Jefferson described

---

8. Dr. Jefferson's policy provides that a reduction in earned income will not qualify as a "Loss of Earned Income" unless it is at least 25% of the insured's average pre-disability income. However, sometime after the policy was issued, Massachusetts Mutual liberalized this condition by decreasing the 25% threshold to 20%.

9. The policy contains the following example explaining this computation:

 *The monthly average of your Earned Income before you became disabled was $1,000. Now, your disability prevents you from earning that amount. For any month that you can earn $400, your Loss of Earned Income is $600, or 60%. For any month that you can earn $800, your loss is less than 25% and there is no Loss of Earned Income for the purpose of this policy. For any month that you can earn only $200, your loss exceeds 75% and the Loss of Earned Income is*

 *considered to be 100%.* [Italics in the policy]
 After Massachusetts Mutual's liberalization of the minimum Loss of Earned Income requirement from 25% to 20%, the $200 loss of earned income in this example would, in fact, qualify as a Loss of Earned Income because it amounts to at least 20% of the insured's average pre-disability income.

10. Two corollaries to this principle are (1) that an insurance company has the burden of proving that an exclusion in its policy applies to a claim, *Interstate Life & Accident Ins. Co. v. Gammons*, 56 Tenn.App. 441, 446, 408 S.W.2d 397, 399 (1966), and (2) that once an insurance company demonstrates that an exclusion applies, the burden shifts to the insured to demonstrate that its claim fits within an exception to the exclusion. *Standard Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d at 8.

the nature of his claimed sickness as "major depression following revocation of license." He checked a box on the form indicating that this sickness did not occur at work. He also identified his sole treating physician was "Wm. Hardin" and stated that Dr. Hardin had treated him, presumably for his "major depression," from June 12, 1990 to the present. When asked "How long were or will you be totally disabled," Dr. Jefferson replied that he had been totally disabled from April 29, 1990 and that he did not know how long his disability would continue.

In addition to the information regarding the nature and treatment of his claimed sickness, Dr. Jefferson provided information regarding his earned income on the "Statement of Claimant" form. He estimated that his earned income for the twelve months immediately preceding the date of his disability, April 29, 1990, had been $150,000 and that his earned income for the highest twenty-four months out of the last five years prior to his disability had been $300,000. He also stated that he had earned nothing for services rendered or work performed from April 29, 1990 to October 1, 1990.

In light of the information Dr. Jefferson supplied to Massachusetts Mutual on October 1, 1990, his disability claim had three essential ingredients. First, the incapacity that reduced his ability to work was his "major depression following [the] revocation of [his] license." Second, that the incapacity for which he was seeking benefits began on April 29, 1990. Third, that

the claimed incapacity has resulted in a 100% loss of earned income after April 29, 1990.

The complexion of Dr. Jefferson's disability claim changed somewhat after Massachusetts Mutual pressed him for more information. After receiving Dr. Jefferson's October 1, 1990 claim form, the company requested him to provide additional information, including his 1985 through 1989 federal income tax returns, his work activities after April 29, 1990, his job description, the disciplinary proceedings before the licensing board, and details of the treatment he had been receiving for depression. Dr. Jefferson provided a great deal of additional information in response to these requests, including his tax returns, materials and transcripts from the disciplinary proceeding, and treatment notes from the professionals whom he had consulted.

In his responses, Dr. Jefferson revealed for the first time that Dr. Richard had treated him for depression from May 1989 through May 1991. He did not explain why he had not listed Dr. Richard on his October 1, 1990 "Statement of Claimant" [11] or why he had stated that his depression had caused his incapacity in April 1990 rather than in May 1989 when he first sought treatment from Dr. Richard. The essence of the information provided by Dr. Richard was that Dr. Jefferson was suffering from "major depression" when he first sought treatment in May 1989. Dr. Richard could not identify precisely when this "major depression" had started but be-

11. Perhaps, Dr. Jefferson did not identify Dr. Richard on the October 1, 1990 form because it asked only for a list of "Treating Physicians." Dr. Richard was a clinical psychologist, not a physician. In common parlance, a physician is a person who possesses a medical degree. This common understanding generally comports with the word's technical meaning. For licensing purposes, a "physi-

cian" is a person who is licensed pursuant to either Chapter 6 or Chapter 9 of Title 63 of the Tennessee Code. Tenn.Code Ann. § 63–6–204(d)(7)(F) (Supp.2001). Chapters 6 and 9 apply to persons with a medical degree or a degree from a school of osteopathic medicine. Psychologists are not licensed under Chapters 6 or 9 but rather under Chapter 11.

lieved that it was the result of cumulative stresses at home and at work, including Jane Roe's complaint to the licensing board. Dr. Richard had also determined that Dr. Jefferson had had dysthymia [12] since childhood or adolescence and that he also had a personality disorder.[13]

The information Dr. Jefferson provided Massachusetts Mutual demonstrated (1) that he had not missed work from 1987 through April 27, 1990, (2) that he had continued to see patients up until the day that the licensing board revoked his license, and (3) that prior to the administrative hearing he had made appointments to see patients during and after May 1990. The records of the licensing board's proceedings revealed that Dr. Jefferson had vigorously asserted throughout that he was a competent clinical psychologist, that he should be permitted to continue to see patients, and that the disciplinary proceedings had provided him with whatever rehabilitation he required.

Dr. Jefferson's federal income tax returns demonstrated that his gross business income had trended steadily upward during the five years from 1985 to 1989 and that his net business income showed a similar trend.[14] His 1990 tax return revealed a precipitous decline in net business income because he was required to close his practice following the revocation of his license in April 1990,[15] and his appointment books indicated that he saw fewer patients between January and March 1990 than he had seen between January and March 1989.[16] Notwithstanding the decrease in the number of patients he saw during the first four months of 1990, Dr. Jefferson reported gross business earnings of $42,472 in 1990 before his license was revoked.[17]

---

**12.** Dr. Richard described dysthymia as a "low grade of depression" that does not necessarily interfere with a person's functioning. In his words, persons with dysthymia "keep going but they are not actualizing their potential or having a lot of fun in life." He also stated that Dr. Jefferson's dysthymia had probably begun in childhood or adolescence. Clearly, Dr. Jefferson's dysthymia did not bring about an incapacity under his disability policy because (1) it began before the policy was in force, (2) it had not reduced his ability to work, and (3) it had not caused a "Loss of Earned Income."

**13.** While Dr. Richard declined to specifically characterize Dr. Jefferson's personality disorder, he determined that Dr. Jefferson had a "sexual addiction." Dr. William Kenner classified Dr. Jefferson's condition as a "narcissistic personality disorder" that caused Dr. Jefferson to lack "the moral courage to tell himself no when it comes to having sex with patients." Both Drs. Richards and Kenner stated that Dr. Jefferson's personality disorder had been in place since childhood or adolescence. Accordingly, like his dysthymia, Dr. Jefferson's personality disorder was not a "mental infirmity" that caused an incapacity under his disability policy because (1) it be-

gan before the policy was in force and (2) it had not reduced his ability to work.

**14.** Dr. Jefferson's net income in 1989 fell below the previous year primarily as a result of a $12,105 deduction for legal fees and professional services stemming from the disciplinary proceeding before the licensing board.

**15.** His net business income in 1990 was $8,666 as compared to $77,414 in 1989.

**16.** Dr. Jefferson claimed that he saw 25% fewer patients in January 1990 than he had seen in January 1989, 29% fewer patients in February 1990 than in February 1989, and approximately 50% fewer patients in March 1990 than in March 1989.

**17.** Had Dr. Jefferson's license not been revoked or suspended in April 1990, his estimated annual gross earnings for 1990 were $127,416 [$42,472 × 3 = $127,416]. These estimated earnings are approximately 86% of his gross business earnings for 1989. Dr. Jefferson offered no clear explanation concerning how an average 35% decline in patients could have resulted in only a 14% decline in revenue. One possible explanation is that Dr. Jefferson had increased his rates.

## C.

Dr. Jefferson takes issue with the trial court's conclusion that he had not "demonstrate[d] a loss of income of at least twenty percent (20%)...." First, he argues that it is uncontradicted that he has earned virtually nothing since the revocation of his license in April 1990. Second, he asserts that his federal income tax returns do not paint an accurate picture of the services he performed each month or of his monthly billings prior to April 1990 because they contained annualized information and because there was a lag time between when he rendered the services and when his patients paid for them.

Dr. Jefferson's first point is well-taken. There can be no reasonable dispute that for every month following April 1990, he has earned at least twenty percent less than his pre-April 1990 average monthly income. Thus, the trial court's conclusion regarding Dr. Jefferson's loss of income after April 1990 is not supported by the preponderance of the evidence. Dr. Jefferson's undisputed testimony establishes that he has not practiced psychology since April 1990 and that he has earned relatively modest amounts from a patent on a mechanical checklist device for pilots and from working as an ariel photographer, a landscaper, and in mortgage sales. It also establishes that he has consistently earned less than eighty percent of his pre-April 1990 average monthly income from these activities.

We fail to see the relevance of Dr. Jefferson's second point. While Dr. Jefferson, like many other professionals, may very well have been paid for his services months after he rendered them, this fact adds little support for his post-April 1990 disability claim. He has already established that he provided no psychological services after April 29, 1990. It is, therefore, irrelevant that he would have been paid months later for his services had he provided them. For our purposes, the relevant facts are (1) that Dr. Jefferson provided no professional services after April 29, 1990, (2) that he earned no income from professional services after that date, and (3) that his earned income in any month following April 29, 1990 has, as far as this record shows, never exceeded eighty percent of his pre-April 1990 average monthly income.

This point might conceivably be relevant were Dr. Jefferson seeking disability benefits for some period prior to April 29, 1990. However, he is not. His October 1, 1990 "Statement of Claimant" pinpoints the beginning date of his disability as April 29, 1990. It necessarily follows that if Dr. Jefferson insists that his disability began on April 29, 1990, he could not possibly be seeking disability benefits for any period prior to that date. Therefore, the circumstances surrounding the payments Dr. Jefferson received for professional services rendered before April 29, 1990 is essentially irrelevant to his claim involving a post-April 1990 disability.

## D.

The fact that Dr. Jefferson's post-April 1990 monthly income has never exceeded eighty percent of his pre-April 1990 average monthly income, does not by itself entitle the doctor to draw disability. To be entitled to disability benefits under his policy, he must also demonstrate that the decline in his monthly income was caused by an incapacity that was "due to sickness or injury." For the purpose of Dr. Jefferson's policy, the term "sickness" includes a "mental infirmity."

The record establishes that Dr. Jefferson has or had at least three mental infirmities-dysthymia, a narcissistic personality disorder, and "major depression." Dr. Jefferson's depression is the only one of

the three that could possibly support a disability claim because its onset occurred after the effective date of his policy.[18] However, Dr. Jefferson's "major depression" will not support his disability claim unless he can also demonstrate (1) that it caused his incapacity to work and (2) that it would have prevented him from practicing as a clinical psychologist even if his license had not been suspended.

**1.**

Dr. Jefferson is not the first professional who has sought disability benefits following the revocation or suspension of a professional license. When called upon to review these claims, the courts have distinguished between persons who are unable to engage in their profession and those who are not allowed to do so. *New York Life Ins. Co. v. Daly*, No. 95–6702, 2001 WL 1231736, at *3–4, 2001 U.S. Dist. LEXIS 16691, at *15–16 (E.D.Pa. Oct. 10, 2001); *BLH ex rel. GEH v. Northwestern Mut. Life Ins. Co.*, 92 F.Supp.2d 910, 918 (D.Minn.2000); *Grayboyes v. General Am. Life Ins. Co.*, No. 92–2515, 1995 WL 156040, at *7–8, 1995 U.S. Dist. LEXIS 4233, at *19–20 (E.D.Pa. Apr. 4, 1995). This distinction is reflected in the courts' differentiation between factual disabilities and legal disabilities.

The courts have repeatedly held that disability insurance policies provide coverage for factual disabilities but not for legal disabilities. *Allmerica Fin. Life Ins. Co. v. Llewellyn*, 139 F.3d 664, 666 (9th Cir. 1997); *Goomar v. Centennial Life Ins. Co.*, 855 F.Supp. 319, 325 (S.D.Cal.1994); 10 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 146:9 (3d ed.1998). They have also noted that disability insurance policies do not insure against a professional's inability to pursue his or her occupation profitably because of a limited patient base or because potential patients or clients are repelled by adverse publicity about his or her conduct. *Grayboyes v. General Am. Life Ins. Co.*, 1995 WL 156040, at *8, 1995 U.S. Dist. LEXIS 4233 at *19.

■ A factual disability is an incapacity caused by illness or injury that prevents a person from engaging in his or her occupation. *Provident Life & Accident Ins. Co. v. Fleischer*, 26 F.Supp.2d 1220, 1223 (C.D.Cal.1998); *Goomar v. Centennial Life Ins. Co.*, 855 F.Supp. at 325; *Solomon v. Royal Maccabees Life Ins. Co.*, 243 Mich.App. 375, 622 N.W.2d 101, 104 (2000). A legal disability includes all circumstances in which the law does not permit a person to engage in his or her profession even though he or she may be physically and mentally able to do so. The courts have found that a legal disability may be the result of incarceration,[19] the revocation or suspension of a professional license,[20]

---

**18.** By all accounts, Dr. Jefferson's dysthymia and narcissistic personality disorder existed long before the effective date of the policy.

**19.** *See, e.g., Nashville Trust Co. v. Prudential Ins. Co.*, 8 Tenn.App. 678, 682–83 (1928) (upholding the denial of disability benefits because the claimant was prevented from working only because he was serving a life sentence); *Massachusetts Mutual Life Ins. Co. v. Ouellette*, 159 Vt. 187, 617 A.2d 132, 135 (1992) (optometrist with atypical paraphelia convicted and imprisoned for lewd and lascivious conduct).

**20.** *See, e.g., Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d 688, 691 (2d Cir.1997) (chemically dependent lawyer prevented from practicing because of the loss of his license); *Provident Life & Accident Ins. Co. v. Fleischer*, 26 F.Supp.2d at 1224–26 (financial planner with depression prevented from working because he could not renew his professional licenses after pleading guilty to four felonies); *Grayboyes v. General Am. Life Ins. Co.*, 1995 WL 156040, at *4, 1995 U.S. Dist. LEXIS 4233, at *19–22 (orthodontist with frotteurism prevented from practicing because his license was suspended for five years); *Goomar v.*

surrendering a professional license as part of a plea agreement or to avoid disciplinary action,[21] or practice restrictions imposed by a licensing board.[22]

Frequently, professionals seeking disability benefits have both a legal and a factual disability because of the same condition. As one court noted, "a blinded bus driver or a drug addicted pilot may [have] lost their licenses for the same condition that renders them totally disabled to drive or fly." *Grayboyes v. General Am. Life Ins. Co.*, 1995 WL 156040, at *8, 1995 U.S. Dist. LEXIS 4233, at *21. However, a person's legal disability does not necessarily render him or her unable to perform the tasks expected of those engaged in the same profession. As the same court noted, "[t]hat some morally indignant parents will not enroll their sons in a private school for boys because a teacher with a sexual disease or perversion involving young girls would not render the person afflicted unable to perform the functions of a teacher, at least in a setting limited to males or adults." *Grayboyes v. General Am. Life Ins. Co.*, 1995 WL 156040, at *8, 1995 U.S. Dist. LEXIS 4233, at *22.

In cases where the person claiming disability benefits has a concurrent legal disability and factual disability, the courts determine which of the two disabilities oc-

curred first. If the legal disability preceded the onset of the factual disability, the courts uniformly hold that the claimant is not entitled to disability benefits. *See, e.g., Allmerica Fin. Life Ins. & Annuity Co. v. Llewellyn*, 139 F.3d at 666 (chiropractor who claimed that the onset of his depression occurred the day after his license was revoked for fraud); *Provident Life & Accident Ins. Co. v. Fleischer*, 26 F.Supp.2d at 1224–26 (financial advisor's depression was brought on by his legal difficulties and incarceration); *Brumer v. National Life of Vt.*, 874 F.Supp. 60, 64 (E.D.N.Y.1995) (podiatrist developed a visual impairment after his license had been suspended). If, however, the onset of the factual disability preceded the legal disability, the courts have consistently declined to treat the subsequent legal disability as a superseding cause of the person's loss of earned income. *BLH ex rel. GEH v. Northwestern Mut. Life Ins. Co.*, 92 F.Supp.2d at 916 n. 2; *Ohio Nat'l Life Assur. Corp. v. Crampton*, 822 F.Supp. 1230, 1233 (E.D.Va.1993).

■ The courts consider three factors when a person seeking disability benefits asserts that a factual disability preceded a legal disability. First, the courts address whether the claimed factual disability is

*Centennial Life Ins. Co.*, 855 F.Supp. at 326 (psychotic physician who sexually abused patients stopped practicing only after revocation of his license); *Gassler v. Monarch Life Ins. Co.*, 276 A.D.2d 585, 714 N.Y.S.2d 126, 127 (2000) (podiatrist prevented from practicing only because of the revocation of his license).

**21.** *See, e.g., Zenk v. Paul Revere Life Ins. Co.*, 171 F.Supp.2d 929, 934–35 (D.Minn.2000) (chemically dependent physician surrendered his license rather than complying with the licensing board's limitations on his practice); *Provident Life & Accident Ins. Co. v. Harris*, No. 4:96–CV–199, 1997 WL 626089, at *4, 1997 U.S. Dist. LEXIS 15752, at *6–11 (W.D.Mich. July 23, 1997) (podiatrist surren-

dered his license after his professional corporation pled guilty to mail fraud); *Solomon v. Royal Maccabees Life Ins. Co.*, 622 N.W.2d at 105–06 (physician with bi-polar disorder surrendered his license after the licensing board began investigating him); *Massachusetts Mutual Life Ins. Co. v. Ouellette*, 617 A.2d at 133–35 (optometrist with atypical paraphelia surrendered his license as part of a plea bargain agreement).

**22.** *See, e.g., Royal Maccabees Life Ins. Co. v. Parker*, No. 98–C–50422, 2001 WL 1110489, at *6, 2001 U.S. Dist. LEXIS 20595, at *24 (N.D.Ill. Sept.20, 2001); *Zenk v. Paul Revere Life Ins. Co.*, 171 F.Supp.2d at 934–35.

medically bona fide. Second, if the claimed factual disability is medically bona fide, the courts address whether its onset actually occurred before the legal disability. Third, if the factual disability is medically bona fide and actually arose before the legal disability, the courts address whether the factual disability actually prevented or hindered the person seeking disability benefits from engaging in his or her profession or occupation.

 Obviously, claimants who cannot satisfy a trier-of-fact that their claimed medical disability is bona fide should not recover disability benefits. Claimants who cannot satisfy the trier-of-fact that their medical disability actually occurred before the legal disability should likewise not recover. Similarly, claimants who cannot satisfy the trier-of-fact that, notwithstanding their legal disability, their medical disability and associated behaviors actually impaired their ability to engage in their profession or occupation should not recover. *Massachusetts Mut. Life Ins. Co. v. Millstein*, 129 F.3d at 691 (holding that a claimant was entitled to disability benefits only if his prior condition rendered him incapable of performing his occupational duties); *Paul Revere Life Ins. Co. v. Bavaro*, 957 F.Supp. 444, 449 (S.D.N.Y.1997) (noting that "[i]f the trier of fact believes that but for ... [the claimant's] legal disability he would be able to perform his occupation, then he is not entitled to disability payments"); *Ohio Nat'l Life Assurance Corp. v. Crampton*, 822 F.Supp. at 1233 (noting that a claimant would be entitled to disability benefits if he would remain unable to work in his currently alleged mental state even if he was placed on probation or his guilty plea was thrown out). Persons who would still be practicing their profession had their licenses not been suspended or revoked are not entitled to disability benefits. *Massachusetts Mut. Life Ins. Co. v. Ouellette*, 617 A.2d at 134.

The cases addressing the nature and extent of a factual disability's effect on a claimant's ability to pursue his or her occupation or profession are not uniform because of differences in the various disability policies' provisions. Policies that condition the payment of benefits on total disability require that a disability have a greater effect on a person's ability to practice than policies that do not. Thus, an emergency room physician whose substance abuse prevented him from working in emergency rooms would be considered totally disabled. *Royal Maccabees Life Ins. Co. v. Parker*, 2001 WL 1110489, at *7-8, 2001 U.S. Dist. LEXIS 20595, at 23–24. With regard to polices that do not condition the right to benefits on total disability, the courts have required claimants to prove a demonstrable qualitative or quantitative drop [23] in performance prior to the onset of the legal disability. *Damascus v. Provident Life & Acc. Ins. Co.*, No. 96–16503, 168 F.3d 498, 1999 U.S.App. LEXIS 1234, at *9 (9th Cir. Jan.27, 1999). The courts will not find a professional to be disabled if the nature and schedule of his or her practice remained essentially unaffected following the onset of the claimed disability. *Goomar v. Centennial Life Ins. Co.*, 76 F.3d 1059, 1062 (9th Cir.1996) (recounting co-workers' testimony that a physician claim-

---

**23.** A qualitative performance reduction relates to the claimant's ability to perform a core and essential aspect of his or her job. A quantitative performance reduction involves the claimant's ability to perform enough tasks or to perform for a long enough period to continue working at his or her regular occupation. *McFarland v. General Am. Life Ins. Co.*, 149 F.3d 583, 588 (7th Cir.1998); *Royal Maccabees Life Ins. Co. v. Parker*, 2001 WL 1110489, at *5, 2001 U.S. Dist. LEXIS 20595, at *19.

ing a mental disability had continued to maintain a normal work schedule); *Zenk v. Paul Revere Ins. Co.*, 171 F.Supp.2d at 934 (denying a chemically dependent physician's disability claim because the nature and schedule of his practice had remained unchanged).

#### 2.

 Massachusetts Mutual was not required to pay Dr. Jefferson disability benefits until he proved that a mental infirmity arising after he obtained his policy had reduced his ability to work before the licensing board revoked his license. Because Massachusetts Mutual's policy does not distinguish among the types of mental impairment that could trigger a disability, the type of mental impairment Dr. Jefferson had or has is irrelevant, as long as it is medically bona fide. *Stern v. Paul Revere Life Ins. Co.*, 744 So.2d 1084, 1087 (Fla. Dist.Ct.App.1999) (declining to "place a judicially imposed value judgment on what type of psychiatric sickness is worthy of consideration as a disability over another type"). However, Dr. Jefferson was obliged to demonstrate that his mental infirmity, whatever it may be, actually hindered his ability to practice psychology.

 Depression qualifies as a mental infirmity under Dr. Jefferson's disability policy. There are, however, different levels of depression, and not all levels of depression impair a person's ability to practice his or her profession. While Dr. Jefferson demonstrated that he was, to some degree, depressed as early as May 1989, he was not entitled to disability benefits until he demonstrated that his depression became so severe that it reduced his ability to work. This is precisely where his case falls short.

Initially, Dr. Jefferson pinpointed April 29, 1990 as the day on which his depression became so severe that it disabled him from practicing as a clinical psychologist. This date was two days after the licensing board had decided to revoke his license. Both Dr. Jefferson's physician and the psychiatrist retained by Massachusetts Mutual to review Dr. Jefferson's claim agreed that the loss of a professional license could trigger a disabling depression. Dr. Hardin stated that Dr. Jefferson was neither mentally nor physically capable of practicing psychology immediately after the revocation of his license. Dr. Kenner agreed that the loss of Dr. Jefferson's license "must have been a significant blow to his over-inflated ego."

Dr. Jefferson, however, shifted the onset of his depression sometime after he submitted his disability claim. He may very well have realized that post-license revocation depression would most likely not warrant the payment of disability benefits. Instead of claiming that his disability was caused by a depression triggered by the loss of his license, he asserted that the onset of his disabling depression occurred at least three years before be lost his license and that he had, in fact, been "very impaired" since 1987. These assertions have two significant shortcomings. First, Dr. Jefferson's treating professionals declined to state categorically that his depression, whenever its onset, had rendered him incapable of practicing psychology prior to May 1990. Second, Dr. Jefferson proved by his own conduct that his depression had not prevented him from continuing to practice psychology until the day the licensing board revoked his license.

Dr. Richard, the clinical psychologist who treated Dr. Jefferson from May 1989 to May 1991, stated that he had diagnosed Dr. Jefferson with a major depression. While he could not determine precisely when this depression began, he stated that its onset was before May 1989 and that it was the result of the cumulative effects of

various stresses in Dr. Jefferson's life, including the regulatory threat to his license. Dr. Richard agreed that psychologists can continue to function with stresses similar to those experienced by Dr. Jefferson but added that they do not function well. Based on the information provided by Dr. Jefferson,[24] Dr. Richard determined that Dr. Jefferson had become "somewhat dysfunctional in his professional life, as well as his home life and personal life." He concluded that Dr. Jefferson's "function would begin to fall off" whenever he "felt that the stress level was supremely high." While Dr. Richard stated on several occasions that Dr. Jefferson's depression "contributed to him making poor decisions and judgments," he never stated that depression prevented Dr. Jefferson from practicing psychology. In fact, despite diagnosing Dr. Jefferson with a major depression and personality disorder, Dr. Richard insisted that Dr. Jefferson was "a very compassionate person who cares about people" and also stated "I don't know that he's not a good therapist."

Dr. Hardin was the only physician who treated Dr. Jefferson for depression. He began treating Dr. Jefferson in June 1990 and stated unequivocally that Dr. Jefferson was mentally and physically incapable of practicing psychology after he lost his license in April 1990. However, Dr. Hardin was far less certain about Dr. Jefferson's circumstances prior to the loss of his license. He conceded that he lacked personal knowledge regarding Dr. Jefferson's ability to discharge the duties and responsibilities of a clinical psychologist from 1987 through early 1990. While he surmised that Dr. Jefferson was "probably" not capable of practicing psychology prior to June 1990, he admitted that he could

not "judge" whether Dr. Jefferson's depression actually affected his work.

Dr. Kenner, the psychiatrist retained by Massachusetts Mutual to evaluate Dr. Jefferson's disability claim, stated that Dr. Jefferson was depressed prior to April 1990 but that he was not so depressed that he was unable to work. He concluded that the loss of his license was a "significant blow" to Dr. Jefferson and that Dr. Jefferson did not have a major depressive disorder until he lost his license. Dr. Kenner opined that Dr. Jefferson's long-standing personality disorder, not his depression, was the root cause of the conduct that had precipitated the disciplinary proceedings against him. And, like Dr. Richard, Dr. Kenner concluded that none of Dr. Jefferson's mental infirmities were compulsive disorders.

The evidence regarding the nature of Dr. Jefferson's practice, most of which Dr. Jefferson himself provided, undermines his claim that a major depression had already impaired his ability to practice psychology by the time the licensing board revoked his license in April 1990. Dr. Jefferson testified that he had been actively practicing psychology since 1977. His annual billings and gross income had increased steadily every year, even after 1987, the year in which Dr. Jefferson claimed that his "major depression" had rendered him "very impaired." By all accounts, the nature of Dr. Jefferson's practice remained essentially unchanged until early 1990.

Dr. Jefferson conceded that he would have continued to practice psychology had the licensing board not revoked his license in April 1990. He insisted throughout the administrative and judicial pro-

---

**24.** Dr. Jefferson told Dr. Richard that he was having difficulty concentrating, that he had lost his appetite, that he was losing motivation for maintaining a schedule, that he was having difficulty tuning in and paying attention to clients, that he found himself falling asleep during sessions, and that he had occasionally become angry with patients.

ceedings involving his license that he was not impaired and that he had done nothing unethical enough to justify revoking his license. He continued to see patients until the very day his license was revoked and had even been setting appointments during the month following the anticipated licensing board's hearing. Dr. Jefferson also acknowledged that he would have continued to see patients had the Board decided not to revoke his license.

The timing and circumstances of Dr. Jefferson's treatment for depression likewise undermine his claim that it significantly affected his ability to practice psychology. Despite his assertion that he had been suffering with a major depression since 1987, he did not seek another psychologist's assistance until May 1989, shortly after Jane Roe filed her complaint against him with the licensing board. When he did consult another clinical psychologist, he chose one who lacked experience or expertise in treating psychologists or other professionals accused of inappropriate sexual conduct with clients or former clients. Similarly, Dr. Jefferson did not seek a physician's assistance for his depression until June 1990, three years after its claimed onset but a little more than one month after the licensing board revoked his license. Dr. Jefferson's expressed purpose for seeking his physician's assistance, according to the physician's treatment notes, was to discuss "going on disability because of depression."

Dr. Jefferson concedes, as he must, that he would not have stopped practicing psychology had the license board not forced him to. However, he asserts that he successfully demonstrated that his pre-April 1990 depression had impaired his ability to practice. In this regard, he points to the evidence (1) that he was in denial about his problems prior to April 1990, (2) that the number of patients he was seeking de-

clined markedly beginning in January 1990, and (3) that the quality of his work had declined. We have determined that each of these facts, even if true, do not necessarily prove that Dr. Jefferson was unable to function as a clinical psychologist prior to the revocation of his license.

Dr. Jefferson insisted throughout the proceedings before the licensing board that he was "a highly qualified and competent psychologist." However, to bolster his disability claim, he downplays these assertions by insisting that he was in denial prior to April 1990 and that he began to overcome this denial only after the licensing board revoked his license. While Drs. Harding and Richard corroborated Dr. Jefferson's claim that he had been in denial, much of the force of the denial argument is undercut by the fact that Dr. Jefferson never conceded to the licensing board that he had been impaired in any way and never acted as if he had become more self-aware after the revocation of his license. Ten months after losing his license, Dr. Jefferson personally proclaimed to the licensing board, "I am so rehabilitated that it is almost beyond description." Throughout the lengthy judicial proceedings to review the licensing board's decision that lasted until December 1997, Dr. Jefferson never departed from his insistence that he was fully competent to practice psychology. The force of the denial argument is also undercut by the concessions of Drs. Hardin and Richard that psychologists with depression are not necessarily incapable of practicing psychology.

Dr. Jefferson also relies on his testimony that he saw far fewer patients during the first three months of 1990 than he did during the same period in 1989. Even if this evidence is true, it does not necessarily establish that Dr. Jefferson treated fewer patients in 1990 because he was unable to treat more. The decline in his patient

base could very well have been caused by other external factors not related to his ability to practice psychology such as increased competition from other psychologists or the spreading awareness in the community where he practiced of his disciplinary problems with the licensing board.

The decline in the number of Dr. Jefferson's patients could also have been caused by concerns on the part of referring physicians about the efficacy of his therapy. The record contains anecdotal evidence that Dr. Jefferson may have been inappropriately impatient, distracted, or preoccupied during several therapy sessions with several of his patients. However, Dr. Jefferson never conceded that his treatment of any patient was improper, and there is no evidence that his impatience, distraction, or preoccupation prevented him from competently treating his patients. Disability insurance policies are not malpractice policies and do not insure against the risk that an otherwise competent professional might render service in a particular case that falls below the prevailing standard of care. Competency is not inexorably linked with capacity. Accordingly, the anecdotal evidence of isolated therapeutic lapses does not establish that Dr. Jefferson's ability to render acceptable psychological services was impaired prior to the revocation of his license.

We have in this case, not an appeal from a summary judgment, but an appeal from a trial court's considered decision following a bench trial. The trial court heard all the testimony, reviewed the exhibits, and assessed the credibility of the witnesses called both by Dr. Jefferson and by Massachusetts Mutual. After weighing all the evidence, the trial court concluded that Dr. Jefferson had failed to demonstrate that his depression had actually impaired his ability to practice psychology before the licensing board revoked his license in April

1990. The evidence, as we see it, supports this conclusion. Accordingly, the record demonstrates that Dr. Jefferson's post-April 1990 loss of income was not due to his depression, but rather to the loss of his license. Because the loss of his license was a legal disability not covered by his disability insurance policy, Dr. Jefferson is not entitled to disability benefits.

## IV.

### MASSACHUSETTS MUTUAL'S CLAIM FOR DISCRETIONARY COSTS

Massachusetts Mutual takes issue with the trial court's denial of its motion for $21,680.15 in discretionary costs. It asserts that the trial court erred because it had prevailed in the declaratory judgment action it was required to file to address Dr. Jefferson's claim. We have determined that the trial court erred by declining to grant $2,514.40 in covered discretionary costs that appear to be necessary and reasonable.

### A.

Following the entry of the judgment declaring that Dr. Jefferson was not entitled to disability payments, Massachusetts Mutual moved to assess $21,680.15 in discretionary costs against Dr. Jefferson under Tenn. R. Civ. P. 54.04(2). Massachusetts Mutual itemized these costs in an affidavit attached to its motion. These costs included: (1) $1,889.40 for court reporter fees, (2) $15,606.50 for Dr. Kenner's fees, (3) $350.00 representing Dr. Hardin's fee to attend his deposition, (4) $275.00 for Dr. Richard's court appearance, (5) $175 for Dr. Bill Phofl, (6) $2,030.00 for the services of Dr. Prudence L. Orr, (7) $1,005.00 for the services of Dr. C. Dawne Kimbrell, (8) $15.25 for copying and for court documents, and (9) $334.00 for Dr. Orr's airfare.

Dr. Jefferson responded that the requested costs should be disallowed because their amount was "exorbitant" and "outrageously unreasonable." He insisted that Dr. Kenner's fee was "ridiculous" and that it should be disallowed because Dr. Kenner "only testified at trial and he never evaluated the defendant, neither was his deposition taken," and because the trial court had not accepted Dr. Kenner's testimony. In more general terms, he argued that Massachusetts Mutual was not entitled to costs under Tenn. R. Civ. P. 54.04(2) because it had initiated the suit and because "in view of defendant losing his license to practice psychology, the requiring of him to pay this amount will work an undue financial burden on him, in that, he is earning his income from mowing lawns."

**B.**

The courts exist in our society to resolve disputes that the parties themselves cannot resolve. While the courts strive to secure a just, speedy, and inexpensive determination of every dispute brought before them, it is an inescapable modern reality that obtaining a judicial resolution of a dispute can be costly and time-consuming. All too frequently, the parties who prevail in litigation are not made whole because their litigation expenses erode the economic value of their recovery. Many judicial systems have allocated the increasing costs of litigation by embracing the principle of loser pays all. American courts, however, have continued to require, as a general matter, each party to be responsible for its own litigation expenses. Thus, the American Rule requires litigants to pay their own attorney's fees in the absence of a statute or contractual provision otherwise. *State v. Brown*

*& Williamson Tobacco Corp.*, 18 S.W.3d 186, 194 (Tenn.2000); *John Kohl & Co. v. Dearborn & Ewing*, 977 S.W.2d 528, 534 (Tenn.1998). Litigants are also required to underwrite the costs of preparing for trial. Traditionally, the only litigation-related costs that a losing party was expected to pay were the statutory costs taxed by the trial court clerk. Tenn. R. Civ. P. 54.04(1).

Tennessee's courts have recognized several modest exceptions to the traditional rules governing the allocation of litigation expenses. These exceptions stem from a desire to make the prevailing party whole. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 85 (Tenn.Ct.App.2000). Thus, even in the absence of a statute or contract, we have recognized that losing defendants in slander of title actions should be required to pay the prevailing plaintiff's legal expenses. *Ezell v. Graves*, 807 S.W.2d 700, 702–03 (Tenn.Ct.App.1990). For similar reasons, the Tennessee Supreme Court has promulgated Tenn. R. Civ. P. 54.04(2) that permits the courts to require losing parties to pay certain other litigation expenses incurred by the prevailing party.

The passage of time has obscured Tenn. R. Civ. P. 54.04(2)'s history. It was first promulgated by the Tennessee Supreme Court on January 23, 1986, and was intended to complement legislation that had been introduced in the Tennessee General Assembly amending Tenn.Code Ann. § 20–12–119 to permit the courts to tax certain litigation expenses as costs.[25] The legislation specifically empowered the court to tax as costs (1) court reporter expenses for depositions and trial, the cost of transcripts, the fees of court-appointed experts, interpreter's fees, and the costs of charts and photographs. 4 Nancy F. Mac-

---

25. *Owen v. Stanley*, 739 S.W.2d 782, 789 n. 4 (Tenn.Ct.App.1987), *rev'd on other grounds,* *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995).

Lean & Bradley A. MacLean, *Rules of Civil Procedure Annotated* § 54.8, at 312 (2d ed.1989).

Tenn. R. Civ. P. 54.04(2)'s companion legislation stalled soon after it was referred to the Senate and House Judicial Committees. On March 18, 1986, faced with the certainty that the General Assembly could not enact the proposed amendments to Tenn.Code Ann. § 20–12–119, the Tennessee Supreme Court submitted a revised version of Tenn. R. Civ. P. 54.04(2) that omitted any reference to the amendment to Tenn.Code Ann. § 20–12–119 that was then foundering in the legislature. Ultimately, the General Assembly approved the revised version of Tenn. R. Civ. P. 54.04(2), even though it never enacted its companion legislation.[26] Thus, as of August 1, 1986, Tenn. R. Civ. P. 54.04(2) read as follows:

> A party who desires to recover discretionary costs or any recoverable costs not included in the bill of costs prepared by the clerk of the trial court shall move the court to assess discretionary costs and attach thereto an itemized and verified bill of costs. The affidavit shall be made by the party or his duly authorized attorney or agent having knowledge of the facts, certifying that such items of costs are accurate and were reasonable and necessary to preparation and trial of the case and that the services for which such fees have been charged were actually performed. The motion shall be filed as a post-trial motion pursuant to Rule 59.01.[27]

The watershed event that shaped the current understanding of Tenn. R. Civ. P. 54.04(2) was *Lock v. National Union Fire Ins. Co.*, 809 S.W.2d 483 (Tenn.1991). In that case, the Tennessee Supreme Court approved the trial court's use of Tenn. R. Civ. P. 54.04(2) to award a prevailing plaintiff (1) the court reporter's appearance fees for the depositions and trial, (2) the court reporter's transcription costs, and (3) the fees charged by the expert witnesses for appearance at their depositions. *Lock v. National Union Fire Ins. Co.*, 809 S.W.2d at 489 n. 3. Noting that the case was its first opportunity to construe Tenn. R. Civ. P. 54.04(2), the court explained that "[i]t was our intent that reasonable and necessary costs, in the preparation and trial of a case, could be assessed as discretionary costs by the trial court." *Lock v. National Union Fire Ins. Co.*, 809 S.W.2d at 490.

In 1993, following the *Lock* decision, the Tennessee Supreme Court amended Tenn. R. Civ. P. 54.04(2) to more precisely define the types of costs that could be recovered and to require that motions seeking these costs must be filed and served within thirty days after entry of the judgment. Tenn. R. Civ. P. 54, adv. comm'n cmt. to 1993 amend. Following other amendments in 1995 and 2001, Tenn. R. Civ. P. 54.04(2) now provides, in part:

> Costs not included in the bill of costs prepared by the clerk are allowable only in the court's discretion. Discretionary costs allowable are: reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions or trials, reasonable and necessary interpreter fees for depositions or trials, and guardian ad litem fees; travel expenses are not allowable discretionary costs.

**26.** Compiler's Notes, Tenn. R. Civ. P. 54, *Tennessee Court Rules Annotated* (Michie 1987–1988).

**27.** The Advisory Commission Comments to the 1986 revisions of Tenn. R. Civ. P. 54, which has not been amended by the Tennessee Supreme Court, still contained a reference to Tenn.Code Ann. § 20–12–119 even though the amendatory legislation had not been enacted.

■ Awarding costs in accordance with Tenn. R. Civ. P. 54.04(2), like awarding other costs, is within the trial court's reasonable discretion. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d 56, 60 (Tenn.1992). Accordingly, we employ a deferential standard when reviewing a trial court's decision either to grant or to deny motions to assess these costs. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d at 84. Because these decisions are discretionary, we are generally disinclined to second-guess a trial court's decision unless the trial court has abused its discretion. *Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d 691, 698 (Tenn.2002); *Stalsworth v. Grummons*, 36 S.W.3d 832, 836 (Tenn.Ct.App. 2000); *Mitchell v. Smith*, 779 S.W.2d 384, 392 (Tenn.Ct.App.1989).

■ The "abuse of discretion" standard of review calls for less intense appellate review and, therefore, less likelihood that the trial court's decision will be reversed. *State ex rel. Jones v. Looper*, 86 S.W.3d 189, 193 (Tenn.Ct.App. 2000); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 222–23 (Tenn.Ct.App.1999). Appellate courts do not have the latitude to substitute their discretion for that of the trial court. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn.1998); *State ex rel. Vaughn v. Kaatrude*, 21 S.W.3d 244, 248 (Tenn.Ct.App.2000). Thus, a trial court's discretionary decision will be upheld as long as it is not clearly unreasonable, *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn.2001), and reasonable minds can disagree about its correctness. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn.2001); *State v. Scott*, 33 S.W.3d 746, 752 (Tenn.2000). Discretionary decisions must, however, take the applicable law and the relevant facts into account. *Ballard v. Herzke*, 924 S.W.2d 652, 661 (Tenn.1996). Accordingly, a trial court has "abused its discretion" when it applies an incorrect legal standard, reaches a decision that is illogical, bases its decision on a clearly erroneous assessment of the evidence, or employs reasoning that causes an injustice to the complaining party. *Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d at 698; *Clinard v. Blackwood*, 46 S.W.3d 177, 182 (Tenn. 2001); *Wilder v. Wilder*, 66 S.W.3d 892, 895 (Tenn.Ct.App.2001); *Robinson v. Clement*, 65 S.W.3d 632, 635 (Tenn.Ct. App.2001).

■ Parties are not entitled to costs under Tenn. R. Civ. P. 54.04(2) simply because they prevail at trial. *Sanders v. Gray*, 989 S.W.2d 343, 345 (Tenn.Ct.App. 1998). The particular equities of the case may influence a trial court's decision about these costs. *Perdue v. Green Branch Mining Co.*, 837 S.W.2d at 60; *Stalsworth v. Grummons*, 36 S.W.3d at 835. However, the courts should, as a general matter, award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion. *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d at 84.

■ A nonspecific antipathy toward awarding discretionary costs under Tenn. R. Civ. P. 54.04(2) appears to continue in some quarters of Tennessee's judiciary. It is not an easy undertaking to reconcile cases upholding the denial of discretionary costs with other cases affirming the award of similar costs based on essentially similar facts. Even though the decisions regarding these costs are "discretionary," a trial court's decision should be guided by the language of Tenn. R. Civ. P. 54.04(2) itself and the policies that led to the rule's enactment. *Stalsworth v. Grummons*, 36 S.W.3d at 835. Thus, when deciding whether to award discretionary costs under Tenn. R. Civ. P. 54.04(2), the courts should (1) determine whether the party requesting the costs is the "prevailing par-

ty," [28] (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable,[29] and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.[30] The courts should not, however, base their decisions to award costs under Tenn. R. Civ. P. 54.04(2) on (1) a desire to punish the losing party,[31] (2) whether the prevailing party is the plaintiff or defendant,[32] or (3) the weight given to a particular witness's testimony.[33]

The party seeking to recover its costs under Tenn. R. Civ. P. 54.04(2) has the burden of demonstrating that it is entitled to recover these costs. *Stalsworth v. Grummons*, 36 S.W.3d at 835. As a general matter, a party seeking these costs must file a timely motion and must support this motion with an affidavit detailing these costs, verifying that they are accurate and that they have actually been charged, and that they are necessary and reasonable. Once a party seeking costs under Tenn. R. Civ. P. 54.04(2) has filed its motion, the non-moving party may present evidence and argument challenging the requested costs. The party who takes issue on appeal with a trial court's decision regarding discretionary costs has the burden of showing how the trial court abused its discretion. *Sanders v. Gray*, 989 S.W.2d at 345.

Proceedings involving discretionary costs, like proceedings involving requested attorney's fees, are frequently decided on affidavits and argument of counsel in light of the entire record. Parties rarely seek contested hearings on requests for discretionary costs and, thus, do not commonly present evidence beyond their competing affidavits. Thus, fully developed records of contested proceedings involving costs under Tenn. R. Civ. P. 54.04(2) are rare and are certainly not required to enable the trial court, or an

---

**28.** *Long v. HCA Health Servs. of Tenn., Inc.*, No. M2001–00505–COA–R3–CV, 2002 WL 459009, at *6 (Tenn.Ct.App. Mar.26, 2002) (No Tenn. R.App. P. 11 application filed); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 302 (Tenn.Ct.App.2001) (vacating an award of discretionary costs because the recipient of these costs was no longer the prevailing party); *Milliken v. Crye Leike Realtors*, No. M1999–00071–COA–R3–CV, 2001 WL 747638, at *12 (Tenn.Ct.App. July 5, 2001), *perm. app. denied* (Tenn. Dec. 10, 2001).

**29.** *Stalsworth v. Grummons*, 36 S.W.3d at 835.

**30.** *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d at 85.

**31.** *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d at 85.

**32.** *Woodlawn Mem'l Park, Inc. v. Keith*, 70 S.W.3d at 698 (holding that "[n]on-prevailing party defendants are not relieved from paying discretionary costs merely because a plaintiff has obliged them to appear in court").

**33.** In one unreported opinion, a panel of this court disallowed expert witness fees solely because the trial court commented that the testimony of the witness had not been helpful to the court. *McCracken v. City of Millington*, No. 02A01–9707–CV–00165, 1999 WL 142391, at *13 (Tenn.Ct.App. Mar.17, 1999) (No Tenn. R.App. P. 11 application filed). We decline to follow this approach because the test is not the weight given to a particular witness's testimony but rather the reasonableness and necessity of expert proof regarding the subject matter. *Stalsworth v. Grummons*, 36 S.W.3d at 836 (awarding an expert witness's appearance fee because there was no showing that expert testimony on the issue would have been cumulative, unhelpful, or unnecessary); *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d 230, 240 (Tenn.Ct.App.1998) (awarding the appearance fee of a testifying expert witness even though the parties disputed the necessity of the testimony).

appellate court for that matter, to review a claim for discretionary costs. In cases where the issue of discretionary costs has been decided on affidavits and the record of the entire proceeding without the presentation of new evidence specifically pertaining to the disputed costs themselves, the trial court's decision can effectively be reviewed without a transcript of the hearing on the Tenn. R. Civ. P. 54.04(2) motion. Accordingly, parties challenging a trial court's decision regarding discretionary costs are not necessarily required to submit a transcript of the hearing on discretionary costs in order to raise the issue on appeal.[34]

## C.

The trial court's order denying Massachusetts Mutual's motion for discretionary costs does not state that the court heard additional evidence regarding discretionary costs at its January 9, 1998 hearing. It states simply that the motion was decided on the "entire record," the "[m]otion to [a]ssess [d]iscretionary [c]osts and supporting pleadings of . . . Massachusetts Mutual Life Insurance Company," the "statement of counsel," and the "filings in support of or in opposition to the pending post-judgment [m]otions." This recitation leaves no room for reasonable doubt that the parties did not present additional evidence regarding Massachusetts Mutual's request for discretionary costs at the January 9, 1998 hearing. Accordingly, having a transcript of this hearing is not necessary to enable us to effectively review the

trial court's decision to deny discretionary costs in this case.

■■■■ Massachusetts Mutual is clearly the prevailing party in this case. It convinced the trial court to declare that it was not contractually obligated to pay Dr. Jefferson disability benefits. It also convinced the trial court to dismiss Dr. Jefferson's counterclaim. The company also filed a timely and properly supported motion seeking discretionary costs. Likewise, the voluminous record contains no evidence that the company engaged in the sort of conduct during the litigation that would disentitle it to recover its costs. Thus, based on the record as a whole, we have concluded that Massachusetts Mutual is entitled to recover its expenses that qualify as discretionary costs and that these expenses are necessary and reasonable.

Based on its affidavit, Massachusetts Mutual is entitled to $1,889.40 for its court reporter fees, $350.00 for Dr. Hardin's fee to appear at his discovery deposition, and $275.00 for Dr. Richard's fee for appearing at trial. By the same token, Massachusetts Mutual clearly is not entitled to $334.00 for Dr. Orr's travel expenses because Tenn. R. Civ. P. 54.04(2) explicitly excludes them. The company is likewise not entitled to the claimed $15.25 in document expenses because they are not among the types of expenses listed in Tenn. R. Civ. P. 54.04(2) that qualify as discretionary costs. Thus, the only remaining disputed costs are the $18,816.50

---

**34.** Other panels of this court have held that they will presume that the evidence supports a trial court's decision regarding discretionary costs in the absence of a transcript or record of the hearing on discretionary costs. *Luna v. Breeding*, No. M2000–01932–COA–R3–CV, 2001 WL 950187, at *3 (Tenn.Ct.App. Aug.22, 2001) (No Tenn. R.App. P. 11 application filed); *Faux v. Spears*, No. 03A01–9312–CV–00433, 1994 WL 147830, at *1 (Tenn.Ct. App. Apr.26, 1994) (No Tenn. R.App. P. 11 application filed); *Moser v. Bibee*, No. 03A01–9209–CV–00347, 1993 WL 133292, at *1 (Tenn.Ct.App. Apr.28, 1993) (No Tenn. R.App. P. 11 application filed). We decline to apply this appeal-ending presumption unless the record affirmatively shows that the trial court's decision regarding discretionary costs was based on evidence other than the parties' affidavits and the record as a whole.

in expert witness fees claimed by Massachusetts Mutual, including Dr. Kenner's $15,606.50 fee.

■■■■ Tenn. R. Civ. P. 54.04(2) limits the types of expenses related to expert witnesses that can be recovered as discretionary costs. Only "reasonable and necessary expert witness fees for depositions and trial" are recoverable. Thus, prevailing parties cannot recover expert witness fees for preparing for depositions or trial, no matter how reasonable and necessary these fees are. *Miles v. Marshall C. Voss Health Care Ctr.*, 896 S.W.2d 773, 776 (Tenn.1995) (permitting the recovery of a vocational expert's witness fee but not the fee charged to examine the plaintiff); *Crawford v. Dodson*, No. W1998–00805–COA–R3–CV, 2000 WL 1286368, at *6 (Tenn.Ct.App. Aug.28, 2000) (No Tenn. R.App. P. 11 application filed); *Shahrdar v. Global Hous., Inc.*, 983 S.W.2d at 239–40. Likewise, they cannot recover the fees of professionals who testify as fact witnesses rather than as experts, *Parks v. Royal Ins. Co.*, No. W2000–02778–WC–R3–CV, 2001 WL 1584107, at *3 (Tenn. Sp. Worker's Comp. Panel Dec. 4, 2001), or for appearances at depositions for proof when the expert also testifies at trial. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 917 (Tenn.1999). Prevailing parties may, however, be able to recover the stand-by fees charged by expert witnesses who were required to be on call but who were not called because of some act attributable to the non-prevailing party. *Stalsworth v. Grummons*, 36 S.W.3d at 836.

The record contains little information regarding the nature of the services provided by Drs. Kenner, Kimbrell, Orr, and Pfohl other than the dates on which the services were rendered and the fees charged for the services. The affidavit supporting Massachusetts Mutual's motion to assess discretionary costs does not explain the nature or purposes of these services. Other parts of the record, including Dr. Jefferson's response to Massachusetts Mutual's motion, establish that Dr. Kenner was not deposed but that he testified at trial on November 15, 1996; that Dr. Pfohl was never deposed and did not testify at trial; and that neither Dr. Orr nor Dr. Kimbrell testified at trial even though one of them was apparently deposed.

■■■■ Massachusetts Mutual, as the party seeking discretionary costs, had the burden of demonstrating that it should be reimbursed for the costs associated with its experts. In light of the nature of Dr. Jefferson's disability claim, it was certainly appropriate for Massachusetts Mutual to decide to present expert testimony regarding Dr. Jefferson's mental infirmities and their effect on his ability to practice psychology. However, Massachusetts Mutual was still obliged to demonstrate that the claimed fees for these experts were necessary and reasonable and were limited to fees charged for appearing at a deposition or trial.

■■■■ The record contains only sketchy information regarding Drs. Kimbrell, Orr, and Pfohl. It provides no factual basis for concluding that their services, whatever they may have been, were necessary and reasonable rather than duplicative of Dr. Kenner's services. It also provides no basis for determining that their claimed fees were limited to fees charged for appearing at trial or at a deposition. Accordingly, Massachusetts Mutual has not demonstrated that it is entitled to reimbursement for the expenses associated with these three experts.

■■■■ Dr. Kenner testified at trial. Despite the trial court's opinion regarding the value of his testimony, presenting expert evidence regarding Dr. Jefferson's mental infirmities and their effect on his ability to practice psychology was necessary and

reasonable. However, Massachusetts Mutual is not entitled to recover any of Dr. Kenner's fees as discretionary costs for two reasons. First, much of his fee plainly involved non-recoverable trial preparation services. Second, the affidavit supporting the motion to assess discretionary costs does not identify which of Dr. Kenner's many fees represented his fee for attending the trial. Accordingly, Massachusetts Mutual has failed to demonstrate that it is entitled to reimbursement for any portion of Dr. Kenner's fees.

## V.

We affirm the trial court's conclusion that Dr. Jefferson has failed to demonstrate that he is entitled to benefits under Massachusetts Mutual's disability policy. We vacate the order denying Massachusetts Mutual's motion to assess discretionary costs and remand the case to the trial court with directions to enter an order awarding Massachusetts Mutual a judgment for discretionary costs in the amount of $2,514.40. We tax the costs of this appeal to David A. Jefferson and his surety for which execution, if necessary, may issue.