IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2017 Session

## WILLIAM JAMES JEKOT v. PENNIE CHRISTINE JEKOT

**Appeal from the Circuit Court for Rutherford County**
**No. 48908    Howard W. Wilson, Chancellor**

———————————————————

**No. M2016-01760-COA-R3-CV**

———————————————————

Following his retirement, an alimony obligor petitioned to terminate his alimony. The parties agreed that the obligor's retirement represented a substantial and material change in circumstances since the original support decree. But the obligor also conceded his ability to pay the alimony. Following a hearing, the trial court determined that the obligor failed to meet his burden of proof and denied his request to terminate his alimony obligation. The court also awarded the obligor's former spouse her attorney's fees without specifying the basis for the award. On appeal, the obligor argues, among other things, that his former spouse had the burden of proving her continuing need for alimony once a substantial and material change in circumstances was conceded. We affirm the denial of the request to terminate alimony but vacate the award of attorney's fees.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Vacated in Part; and Remanded**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Katie M. Zipper, Franklin, Tennessee, (on appeal) for the appellant, William James Jekot.

Darrell L. Scarlett, Murfreesboro, Tennessee, for the appellee, Pennie Christine Jekot.

### OPINION

### I.

Dr. William James Jekot and Ms. Pennie Christine Jekot divorced in 2005. They have been at odds over the issue of spousal support ever since.

A.

In the original divorce proceeding, the trial court awarded Ms. Jekot rehabilitative alimony in the amount of $15,000 per month for the first twelve months following the divorce, $10,000 for the succeeding twenty-four months, and $5,000 for the twenty-four months thereafter. Dr. Jekot challenged the award on appeal; Ms. Jekot contended that the award should have been designated as alimony *in futuro*.

In *Jekot v. Jekot* (*Jekot I*), this Court agreed with both parties. 232 S.W.3d 744 (Tenn. Ct. App. 2007). We found "that the initial award of alimony of $15,000 per month was not adequately supported by the evidence." *Id.* at 753. So we modified the award to $9,000 per month. *Id.* We noted that, "[w]hile this amount does not differ from the *average* monthly amount of alimony awarded by the trial court over the sixty months the court allowed for [Ms. Jekot's] rehabilitation, it provides that each payment is consistent with [Ms. Jekot's] actual monthly needs." *Id.*

We also modified the award to alimony *in futuro*, concluding that the award of rehabilitative alimony was inconsistent with the facts. *Id.* Given Ms. Jekot's age, 55 at the time of trial, and the fact that she had not used her career skills in two decades, we deemed the expectation that Ms. Jekot would "be able to effectively compete for employment as she near[ed] an age at which many retire" unrealistic.[1] *Id.*

Five years later, in *Jekot v. Jekot* (*Jekot II*), Ms. Jekot asked us to review a substantial reduction in her alimony award. 362 S.W.3d 76, 77 (Tenn. Ct. App. 2011). Dr. Jekot claimed "that his income had decreased dramatically in the three years following the divorce" while Ms. Jekot's need "had diminished," primarily due to income from a medical office building she had been awarded in the division of marital property. *Id.* at 78. The trial court found that Dr. Jekot's income as an orthopedic surgeon "had decreased by one-third" and reduced Ms. Jekot's alimony to $5,000 per month. *Id.* at 78-79.

We reversed the trial court, determining that the evidence preponderated against the "finding that a substantial and material change of circumstance [had] occurred since the entry of the order setting alimony in 2005." *Id.* at 84. Dr. Jekot's practice income had decreased, but after taking into account other income sources, his average annual income in the years following the divorce had actually increased by over $200,000. *Id.* at 82. Dr. Jekot also claimed that his expenses had increased since the divorce, and the

---

[1] One member of the panel did not share that view and dissented from the amount of alimony awarded. *Jekot I*, 232 S.W.3d at 754 (Swiney, J., concurring and dissenting). Although agreeing that alimony *in futuro* was appropriate under the facts, the dissenter objected to the "assumption" that Ms. Jekot had "absolutely zero earning capacity" and found that $9,000 per month exceeded Ms. Jekot's "proven needs." *Id.* at 754-55.

proof supported such a finding. But "the only substantial change in his expenses [wa]s that he now pa[id] alimony." *Id.* at 83. So the increase could not constitute a material change in that it did not occur after entry of the divorce decree and it was not unanticipated at the time of the decree. *Id.*

In *Jekot II*, we also examined the claim that Ms. Jekot's need for alimony had decreased. We reasoned that, even if Ms. Jekot was receiving income from the medical office building as Dr. Jekot claimed, the income was not unanticipated at the time of the divorce decree and the award of alimony. *Id.* at 84. Thus we concluded that the receipt of that income could not justify a change in the amount of alimony awarded.

B.

Less than four years after our decision in *Jekot II*, Dr. Jekot was back in the Circuit Court for Rutherford County, Tennessee, petitioning for termination of his alimony. Now 66 years old, he planned to retire. As grounds for termination of his alimony obligation, in addition to his retirement, Dr. Jekot pointed to many of the same facts examined in *Jekot II*, such as diminishing income from his medical practice and the impact of the division of marital property.

The court conducted a one-day hearing on the petition at which the parties and Dr. Jekot's investment advisor testified.[2] At the outset of the hearing, counsel for Dr. Jekot agreed that Dr. Jekot had the ability to pay the alimony even following retirement.[3] Still Dr. Jekot claimed that the evidence would show that Ms. Jekot had no need for alimony.

According to the testimony, Dr. Jekot retired on July 1, 2015. Prior to that, he had practiced orthopedic surgery in Murfreesboro for thirty-three years. Beyond his age, he explained that the reason for his retirement was that the income from his practice had been declining over the years due to increasing competition and the retirement of many of his referring doctors. Dr. Jekot had also developed a hand tremor, so he no longer could perform surgery.

Dr. Jekot "lived frugally and invested wisely." So even with declining income from his medical practice, he had managed to contribute $50,000 per year to his retirement fund. And his assets had grown significantly since the divorce from roughly

---

[2] Chancellor Howard W. Wilson was assigned to preside over the proceedings after the recusal of the presiding circuit court judge, the Honorable Keith Siskin.
[3] In his opening statement, counsel stated Dr. Jekot "has the ability to pay, but it's a qualified ability to pay where you say it would be grossly inequitable to take what he has saved and preserved to fund her animal shelter and these other interests that [Ms. Jekot] has . . . ."

3

$1.5 million to $4.5 million. Dr. Jekot testified to having liquid assets of approximately $4.3 million, including a savings account of more than $2.1 million.

Dr. Jekot's testimony confirmed he had the ability to pay Ms. Jekot alimony following retirement and that he could do so without going into debt. But he agreed with the statement that "eventually" he would have to "dip[] into the money that [he] received at the time of the original property division" to make alimony payments. He also offered that his alimony obligation could adversely impact his ability to make planned gifts of "[a]pproximately a million dollars each" to "the University of Michigan orthopedic department and University of Notre Dame where [he] went to college." He sought the "freedom" to fund those gifts over his former spouse's charitable interests.

His counsel asked Dr. Jekot several questions about his former spouse's need for alimony. Given the assets she received as part of the divorce, Dr. Jekot could think of no reason why Ms. Jekot would have any need for alimony, let alone alimony of $9,000 per month. Despite his own monthly budget, excluding alimony, taxes, and investment advisory fees, exceeding $6,700, Dr. Jekot opined that Ms. Jekot needed only $2,000 per month to support herself. He felt that his former spouse's need could be satisfied through social security and rental income from the medical office building she was awarded in the divorce.

Ms. Jekot, who was 66 at the time of the hearing, testified that she had not worked or sought employment since the divorce. Her background was in education, but in order to be licensed to teach, she would have needed additional training. She lived on her alimony and social security of $1,200 per month.

Ms. Jekot's testimony revealed no specifics about her expenses. Efforts by Dr. Jekot's counsel to have Ms. Jekot to itemize her monthly expenses proved fruitless. Instead Ms. Jekot would refer to her check register or credit card statement as the best indication of her monthly expenses. For example, when Dr. Jekot's counsel asked Ms. Jekot about her monthly utility expenses, the following exchange took place:

Q:     Well, how much is your electric —

A:     Mr. Burger, I have no idea.

Q:     Don't your records show that it's about three to four hundred dollars a month?

A:     No.

Q:     Okay. Well, can you — if you don't — how can you tell me it's not 400 a month if you don't know what it is?

A:     I know it's more than that. I'm usually writing a check —

4

Q:     Approximately what do you think it is?

A:     In the summer my utilities for my heat — or my air — excuse me — are way over $400.

Q:     About what do you think they're reflected on your tax return, ma'am? I mean, I'm sorry, on your —

A.     I'm [sic] have to see the checkbook register for me to even make a judgment on it.

Q.     Okay.

At one point, Dr. Jekot's counsel suggested that Ms. Jekot's expenses were only about $3,500 or $4,000 a month. Ms. Jekot replied:

A:     You said that in the first hearing. You said it in the second hearing. It's totally nonsense.

Q:     Ma'am, I —

A.     It is absolutely not factual and it is — every bit of the alimony that I get is spent on my expenses.

Ms. Jekot also denied that she was using her alimony to support an animal shelter that she had founded. Although she admitted making an occasional loan to the shelter, she claimed to have always been repaid.

The investment advisor testified that he was managing assets of Dr. Jekot with a current value of about $4 million. When asked if Dr. Jekot could pay $9,000 per month in alimony "without dissipating substantially his core financial savings," the advisor could only say "[i]t could be a challenge at some point if we have another period like 2000 to 2002 where we have three years of a down market." The advisor went on to explain that, "if the market remains vigorous and active and positive, [Dr. Jekot] might have a very positive financial future."

Following the close of proof, counsel for Ms. Jekot stipulated that Dr. Jekot's retirement was "objectively reasonable." Yet Ms. Jekot's counsel maintained that Dr. Jekot had failed to meet his burden of proof.

The trial court agreed and denied the petition to terminate alimony. The court found that, even absent the stipulation, "the evidence overwhelmingly demonstrates" that Dr. Jekot's retirement was objectively reasonable. But "given the amount of wealth he has accumulated and amounts he continues to accumulate through investments," Dr. Jekot had the ability to pay his support obligation. As for need, based on her bank account statements, the court found that Ms. Jekot's need for alimony had actually

5

increased since the divorce. The court specifically credited her testimony that her expenses were "necessary for the maintenance of her assets and overall standard of living as enjoyed throughout the duration of the [p]arties['] marriage." And the court found "no evidence elsewhere in the record to indicate that expenses reflected in [Ms. Jekot's] checking account statement are unnecessary, unreasonable, frivolous, or unreflective of [Ms. Jekot's] actual financial need."

The memorandum and order went on to provide that "[c]ourt costs, discretionary costs, and attorney fees for Respondent are taxed to Petitioner." Ms. Jekot later filed both a motion for approval of fee award with a supporting affidavit from her counsel and a motion for approval of discretionary costs. The court entered an order on the motions awarding Ms. Jekot attorney's fees of $14,280 and discretionary costs of $508.

## II.

On appeal, Dr. Jekot raises six issues for our review. The first four issues relate to the denial of his request for termination of his alimony obligation. The fifth issue relates to the trial court's award of attorney's fees, discretionary costs, and court costs to Ms. Jekot. Finally, Dr. Jekot requests an award of attorney's fees incurred on appeal, as does Ms. Jekot.

## A.

The type of alimony awarded to Ms. Jekot, alimony *in futuro*, "remain[s] in the court's control for the duration of such award, and may be increased, decreased, terminated, extended or otherwise modified, upon a showing of substantial and material change in circumstances." Tenn. Code Ann. § 36-5-121(f)(2)(A) (2017). A "substantial" change is one that "significantly affects either the obligor's ability to pay or the obligee's need for support." *Bogan v. Bogan*, 60 S.W.3d 721, 728 (Tenn. 2001) (citing *Bowman v. Bowman*, 836 S.W.2d 563, 568 (Tenn. Ct. App. 1991)). To be material, the "change in circumstances must have occurred since the entry of the divorce decree ordering the payment of alimony" and "must not have been foreseeable at the time the parties entered into the divorce decree." *Watters v. Watters*, 22 S.W.3d 817, 821 (Tenn. Ct. App. 1999).

"[W]hen an obligor's retirement is objectively reasonable, it does constitute a substantial and material change in circumstances – irrespective of whether the retirement was foreseeable or voluntary . . . ." *Bogan*, 60 S.W.3d at 729. Typically, the determination of whether a retirement is objectively reasonable requires an examination of "the totality of the circumstances surrounding the retirement." *Id.* Here, as noted above, Ms. Jekot stipulated that Dr. Jekot's retirement was objectively reasonable.

But an objectively reasonable retirement, which is deemed a substantial and material change in circumstance, does "not necessarily entitle[]" an obligor "to an

6

automatic reduction or termination of his or her support obligations." *Id.* at 730; *see also* Tenn. Code Ann. § 36-5-121(f)(2)(A) (directing that alimony *in futuro* "*may* be increased, decreased, terminated, extended or otherwise modified, upon a showing of substantial and material change in circumstances" (emphasis added)). The substantial and material change in circumstance brought on by the retirement "merely allows the obligor to demonstrate that reduction or termination of the award is appropriate." *Id.* The obligor does so by reference to the factors used in determining an initial award of alimony, which are set forth in Tennessee Code Annotated § 36-5-121(i). *See id.* (citing the predecessor to Tenn. Code Ann. § 36-5-121(i)).

While Tennessee Code Annotated § 36-5-121(i) identifies several factors that may be relevant to the analysis,[4] "the two most important considerations in modifying a spousal support award are the financial ability of the obligor to provide for the support and the financial need of the party receiving the support." *Id.* Unlike at the initial award of alimony stage when the need of the receiving spouse is deemed a more important consideration, however, in deciding whether to modify alimony "the ability of the obligor

---

[4] The statutory factors, some of which may not be relevant in every circumstance, are as follows:

> (1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;
> (2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;
> (3) The duration of the marriage;
> (4) The age and mental condition of each party;
> (5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;
> (6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;
> (7) The separate assets of each party, both real and personal, tangible and intangible;
> (8) The provisions made with regard to the marital property, as defined in § 36-4-121;
> (9) The standard of living of the parties established during the marriage;
> (10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;
> (11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and
> (12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-121(i) (2017).

to provide support must be given at least equal consideration" to the need of the recipient. *Id.*

Dr. Jekot argues that the trial court erred in four respects in denying his request to terminate his alimony obligation. First, he submits that the trial court erred in placing the burden on him to prove Ms. Jekot's need for support. We can quickly dispense with this issue as our supreme court has placed the burden on "the obligor to demonstrate that reduction or termination of the award is appropriate." *Id.* at 730. If there was a change in Ms. Jekot's need that would support a reduction or termination of her alimony award, Dr. Jekot had the burden of establishing that change.

Second, Dr. Jekot argues that the trial court erred in finding that Ms. Jekot needed $9,000 per month in alimony *in futuro* when Ms. Jekot was unable to provide a list of her expenses. The issue is premised on the false notion that Ms. Jekot bore the burden of proving her need. To the extent the issue challenges the underlying factual finding made by the trial court, we presume the correctness of the finding, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

The evidence here does not overcome the presumption of the correctness of the trial court's findings. Ms. Jekot testified to spending all of the alimony on her monthly expenses and that her monthly expenses were accurately reflected in her bank and credit card statements. Dr. Jekot introduced into evidence 13 months of bank statements, and based on those statements, the trial court calculated her monthly withdrawals as averaging $10,500 per month. The court also specifically credited her testimony that her expenses were "necessary for the maintenance of her assets and overall standard of living as enjoyed throughout the duration of the [p]arties marriage." We "afford great weight" to factual findings based on credibility determinations. *Cornelius v. Tenn. Dep't Children's Servs.*, 314 S.W.3d 902, 907 (Tenn. Ct. App. 2009).

Third, Dr. Jekot argues that the trial court erred in requiring him to satisfy his alimony obligation from his award of marital property. This argument is unavailing. In response to a leading question from his attorney, Dr. Jekot agreed with the statement that "eventually" he would have to "dip[] into the money that [he] received at the time of the original property division" to make alimony payments. But Dr. Jekot never elaborated on this claimed eventuality or specified when or under what circumstances it might occur. And his own financial advisor testified that Dr. Jekot could satisfy his alimony obligation from investment earnings.

Fourth, Dr. Jekot argues that the trial court abused its discretion in failing to terminate or modify his alimony obligation. Modification of an alimony award is a factually driven determination that requires a balancing of factors. *Brown v. Brown*, 913 S.W.2d 163, 169 (Tenn. Ct. App. 1994). So the determination of whether to modify or terminate an alimony award is discretionary. *See Bogan*, 60 S.W.3d at 727. An abuse of

discretion occurs when a court "causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

The trial court did not abuse its discretion here. The court "properly identified and applied the most appropriate legal principles applicable to the decision." *See id.* The court first considered whether Dr. Jekot's retirement was objectively reasonable and determined, based on both Ms. Jekot's stipulation and the facts, that a substantial and material change in circumstance had occurred. The court then looked to the statutory factors for setting alimony, focusing on the financial ability of Dr. Jekot to provide for the support and the financial need of Ms. Jekot. The findings concerning Dr. Jekot's ability to pay alimony and Ms. Jekot's need are "properly supported by evidence in the record." *See id.* And the decision to deny Dr. Jekot relief "was within the range of acceptable alternative dispositions." *See id.*

B.

In its memorandum and order, the trial court "taxed" Dr. Jekot court costs, discretionary costs, and the attorney's fees of Ms. Jekot. Ms. Jekot later filed a "Motion for Approval of Fee Award," which requested approval of attorney's fees as evidenced by an attached affidavit. Dr. Jekot contends that the court erred in its awards to Ms. Jekot.

"Costs included in the bill of costs prepared by the clerk shall be allowed to the prevailing party unless the court otherwise directs." Tenn. R. Civ. P. 54.04(1). Dr. Jekot's assignment of error relative to court costs is based on his belief that he should have been the prevailing party. Because we disagree, the trial court did not err in awarding Ms. Jekot court costs.

For the same reason, Dr. Jekot challenges the award of discretionary costs. Discretionary costs are "[c]osts not included in the bill of costs prepared by the clerk" and include, among other things, "reasonable and necessary court reporter expenses for depositions or trials." *Id.* 54.04(2). As the name implies, discretionary costs are awarded in the trial court's discretion. *Id.*

As the party seeking discretionary costs, Ms. Jekot bore the burden of demonstrating her entitlement to recover such costs. *See Carpenter v. Klepper*, 205 S.W.3d 474, 490 (Tenn. Ct. App. 2006). In most instances, the burden is a four-part showing of (1) being the prevailing party, (2) costs specified in Tennessee Rule of Civil Procedure 54.02(c), (3) which are necessary and reasonable, and (4) the absence of "conduct during the litigation that would justify depriving [the requesting party] of the costs." *Duran v. Hyundai Motor Am., Inc.*, 271 S.W.3d 178, 215 (Tenn. Ct. App. 2008). Unlike court costs, "[p]arties are not entitled to costs under Tenn. R. Civ. P. 54.04(2)

9

simply because they prevail at trial." *Mass. Mut. Life Ins. Co. v. Jefferson*, 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002). But in most circumstances "courts should . . . award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." *Id.*

We conclude there was no abuse of discretion on the part of the trial court. Ms. Jekot was the prevailing party, and she sought only the recovery of costs specified under Rule 54.04(2) that were both reasonable and necessary. And she filed a timely and properly supported motion for the costs.

Concerning the award of attorney's fees, we are hampered in our review because Ms. Jekot did not specify the basis for her request for an award of attorney's fees, and the trial court's order does not cite to the authority for its award. Under the "American rule," which is followed in Tennessee and most other jurisdictions, "a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case." *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009).

In post-divorce legal proceedings such as this one, a marital dissolution agreement may create a right to recover attorney's fees. *See Eberbach v. Eberbach*, 535 S.W.3d 467, 474-75 (Tenn. 2017). Another common basis for an award of attorney's fees is Tennessee Code Annotated § 36-5-103(c), also known as "Tennessee's Enforcement of Orders statute." *Id.* at 475. The version of the statute in effect at the time this matter was decided allowed "[t]he plaintiff spouse [to] recover . . . reasonable attorney fees incurred in enforcing any decree for alimony . . . at any subsequent hearing . . . in the discretion of such court."[5] Tenn. Code Ann. § 36-5-103(c) (2017). We also note that, in *Jekot II*, Ms. Jekot unsuccessfully sought an award of attorney's fees under Tennessee Code Annotated § 36-5-121. *Jekot II*, 362 S.W.3d at 85-86. But reliance on that statute in connection with a post-divorce petition to terminate alimony would be problematic. *See Scherzer v. Scherzer*, No. M2017-00635-COA-R3-CV, 2018 WL 2371749, at *22-23 (Tenn. Ct. App. May 24, 2018) (McBrayer, J., concurring).

In their briefs, both parties discuss the trial court's award of attorney's fees in terms of the court's discretion. This suggests that the award was made under a statute rather than a contract. Yet we cannot be certain under what statute the court awarded fees. Under the circumstances, we vacate the award of attorney's fees. On remand, Ms. Jekot must specify the contractual or statutory provision under which she claims a right to

---

[5] Effective July 1, 2018, Tennessee Code Annotated § 36-5-103(c) allows "[a] prevailing party [to] recover reasonable attorney's fees . . . in any . . . proceeding to enforce, alter, change, or modify any decree of alimony." 2018-2 Tenn. Code Ann. Adv. Legis. Serv. 236 (LexisNexis).

recover her attorney's fees or identify some other recognized exception to the American rule.

C.

Both parties request an award of attorney's fees incurred on appeal. But, neither party provides the basis for their request. So we decline to award either party their attorney's fees on appeal.

**III.**

We vacate the award of attorney's fees to Ms. Jekot, but we affirm the decision of the trial court in all other respects. Although his retirement was objectively reasonable and constituted a substantial and material change in circumstance, Dr. Jekot failed to demonstrate that a reduction or termination of his alimony obligation was appropriate. This matter is remanded for further proceedings consistent with this opinion.

_____
W. NEAL MCBRAYER, JUDGE