IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 5, 2026

## CHARLOTTE R. SAPPO v. 4404 HOLDINGS, LLC

**Appeal from the Chancery Court for Davidson County**
No. 23-1322-II      Anne C. Martin, Chancellor

_____

### No. M2025-00279-COA-R3-CV

_____

A homeowner brought suit against the owner of the house next door, asserting a claim for breach of a joint driveway agreement and an alternative action for a declaratory judgment that the neighbor had abandoned the easement created by the driveway agreement. The neighbor filed counterclaims for a declaratory judgment, trespass, and an alternative claim for rescission for failure of consideration. After a trial, the trial court entered a final order determining the boundaries of the easement established by the driveway agreement; the court rejected the plaintiff's claims for breach of the easement and abandonment as well as the defendant's claim for trespass. On appeal, the plaintiff argues that the trial court erred in its rulings regarding the boundaries of the easement, its denial of her claims for breach of the easement and abandonment, and in its award of discretionary costs to the defendant. We find no error and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which THOMAS R. FRIERSON, II, and CARMA DENNIS MCGEE, JJ., joined.

Charlotte R. Sappo, Nashville, Tennessee, pro se.

Gibeault Cooper Creson, Evan Stephen Rothey, and W. Scott Sims, Nashville, Tennessee, for the appellee, 4404 Holdings, LLC.

## OPINION

FACTUAL AND PROCEDURAL BACKGROUND

This case concerns a shared driveway located between the houses at 407 and 409 32nd Avenue South in Nashville. Charlotte Sappo purchased the 409 property in April 2021. The 407 property was purchased by 4404 Holdings, LLC ("the Holdings"), a single-asset

LLC formed by Eric and Joellyn Helman, in March 2021. Clark Helman, the son of Eric and Joellyn, moved into the 407 property with his wife, Melissa Mangold, in July 2021. In order to understand the dispute that arose between the parties, it is necessary to examine some of the history of these pieces of property.

In 1960, the two pieces of property were owned by the Chandler family (409) and the Hunt family (407). As illustrated below, a portion of the Chandlers' backyard and garage was located within the Hunts' property, and a portion of the Hunts' front yard was located within the Chandlers' property. In addition, the two houses shared a concrete driveway, which came off of 32nd Avenue South and was located partially on each neighbor's property. In the weeks preceding the Chandlers' sale of their home in May 1960, the neighbors entered into two agreements in an apparent attempt to resolve any boundary issues. First, the Chandlers and the Hunts executed warranty deeds to exchange two triangular parcels of land, thereby bringing the Chandlers' garage and backyard onto their property and the rest of the Hunts' front yard onto their property.



In this boundary survey of a tax map, the property lines before the triangle exchange are shown in light grey, and the new boundary line is bolded.

A few days after the triangle exchange, on May 3, 1960, the Chandlers and the Hunts entered into a joint driveway agreement ("JDA"), which began with a description of the triangle exchange and continued as follows:

WHEREAS, the said Douglas B. Chandler and wife, Eula Chandler, and Evans B. Hunt and wife, Irene Hunt, jointly use a driveway partially located on the property of each of the parties and have made joint use of said driveway for as long as each have owned their respective properties; and

WHEREAS, said driveway is located along the southwesterly margin of 32nd Avenue, South, formerly Orient Circle, at a point north 36º west 69.1 feet from the intersection of Marlborough Avenue with 32nd Avenue, South, and runs back along the common dividing line between each of the properties hereinabove referred to; and

WHEREAS, it is the desire of said property owners, as evidenced by their signatures hereto, that said driveway continue to be used as a joint driveway by them and by the heirs, assigns and personal representatives of the parties thereto.

It is, therefore, agreed by the parties hereto that said joint driveway as now located along the common dividing line between their respective properties is hereby agreed to be used as a joint driveway for the use and benefit of their respective properties, and that their heirs, assigns and personal representatives shall have the right to the use of said joint driveway.

The easement is referenced in the chain of title for both properties.

As stated above, both parties to the present dispute purchased their properties in 2021. In August 2023, Ms. Sappo filed this lawsuit against the Holdings, asserting a claim for breach of the JDA and seeking injunctive relief and damages to enforce "Plaintiff's continuing right to unimpeded use of a shared driveway." In the alternative, Ms. Sappo sought a declaratory judgment that the Holdings had abandoned their rights under the JDA. Ms. Sappo claimed, in part, that a retaining wall on the Holdings' property, erected in 2019, "makes it difficult to maneuver around when using the shared driveway to access Plaintiff's Property as intended by the Driveway Agreement, preventing automobiles larger than a compact car from accessing the back yard of Plaintiff's Property and preventing Plaintiff's Property from full use of the driveway."

In November 2023, the trial court granted Ms. Sappo a temporary injunction enjoining the Holdings from obstructing her "use of that certain 27 x 71 inch rectangular area, abutting Defendant's existing retaining wall located at the rear of Defendant's property and the edge of the concrete portion of the shared driveway, in any manner or taking any other action which would prevent Plaintiff and her guests from" using the driveway or accessing the rear of her property with a compact car. In a subsequent order entered in February 2024, the trial court clarified the dimensions of the protected area, shown in the picture below.



The Holdings answered the complaint and asserted counterclaims for trespass, declaratory relief regarding the easement boundaries, and, in the alternative, rescission.

The matter proceeded to a bench trial over four days in December 2024. Because most of the underlying facts found by the trial court are not in dispute, we will quote from the trial court's order:

> Plaintiff demonstrated that the historic use of the Easement, at the time it was created, was for the Properties' owners to access the back of their homes and garages behind the homes. Prior to the property line adjustment in 1960, both garages were on the 407 Property, which was rectified by the boundary line adjustment. For some period of time those garages remained intact, as was evidenced by the testimony of prior owners (summarized herein). They were used for parking cars although over time those uses ceased and they were both removed from the Properties by 1980.

> The parties established the ownership of the Properties between 1960 and 2021 through recorded instruments as follows:

> [chart showing ownership history and detailed summary of the various uses of the easement omitted]

> The Whites owned the 407 Property prior to selling to Defendant (6.7.16-3.20.21) and lived there several weeks after the sale. They parked on

Marlborough or on the blacktop/asphalt parking area behind the house where they built the patio and retaining wall at issue. . . . While living at the 407 Property, they did modify the backyard in 2019 to replace the asphalt with a brick patio bordered by a short retaining wall, and add a storage building, as follows: [photos omitted] They decided not to extend the retaining wall to the property line but "kept it in the same footprint of the asphalt for that line." Notably, there was a metal pole and mature tree at or near the property line behind the concrete driveway that the Whites left in place and shown below: [photo omitted] After Plaintiff purchased the property, she removed the tree; after Defendant purchased the 407 Property, Eric Helman removed the metal pole.

After installation of the patio and retaining wall, none of the prior 409 Property residents before Plaintiff had an issue with accessing the backyard. Further, the fence located in the front of the house was there the entire time the Whites lived there, and there was never an issue with people being unable to access the driveway because of the fence. The Whites parked next to their house off Marlborough and did not use the Easement. They knew they had rights in the Easement, however, and never disclaimed those rights to prior owners of the 409 Property or Plaintiff after her purchase.

(Citations to record omitted).

As detailed by the trial court, "Both parties did work on the Properties after their purchase." The trial court outlined the extensive work done by Ms. Sappo, including adding dormers to the second floor, building a fence in the rear, pouring "gravel onto the back yard to make it more usable for parking," and removing the "mature tree near the garage foundation." Thus, "[t]he property was an active construction site for many months." The trial court further found:

Using the Easement for access to the backyard was a challenge because of its narrowness and because of the poor condition of the concrete. Relevant to this action, Plaintiff modified the corner of her house at the driveway to install and bury PVC piping, covering it with features to prevent it being driven over, narrowing or eliminating that area as one that could be driven over when accessing her backyard. At the time of her purchase, it was an above-ground gutter with an old clay pipe buried underneath. Plaintiff also laid gravel in the backyard to create a more appropriate area for parking behind her house. . . .

Defendant did work at the 407 Property as well, although on a much smaller scale. Around the fall of 2021, the owner put in sod, planted an arborvitae tree by the patio, replaced the fence and planted decorative grass

for the front fence and driveway. [photos omitted] Mr. Helman testified that the sod measured approximately 9-15 inches with 20-21 inches of buffer to the property line at the top of the driveway. In addition, he also removed the metal pole.

The trial court went on to describe in detail the incidents that escalated into the dispute over the use of the easement. First, a contractor hired by Ms. Sappo poured gravel into her backyard, and some gravel "was poured over the property line onto the 407 Property, which had been freshly sodded on that side." Eric Helman objected to this encroachment onto his property. In addition, Ms. Sappo had "been driving her car over the sod causing damage to it." Mr. Helman met with the contractor, who agreed that the gravel was encroaching. Second, in March 2022, Ms. Sappo's contractor "broke the concrete pad of the driveway with his construction equipment," and Ms. Sappo "had concrete poured to repair it without consulting Defendant." The contractor addressed the encroachment of the gravel, and the driveway remained "as repaired," with the parties leaving open the possibility of a future resolution. Then, "[t]he parties lived in relative harmony until August of 2023."

In August 2023, while Ms. Sappo was out of town, her mother, Geraldine Fusco, was staying at the house. Clark Helman "became frustrated with Plaintiff and her mother driving over the newly installed sod on his side of the property line, above the concrete driveway, and placed stones in the triangular area where they had been driving." There was a heated meeting in the driveway with Ms. Sappo, her mother, and Eric and Clark Helman. Soon thereafter, this lawsuit was filed.

At trial, both parties presented expert testimony regarding the easement, its history and boundaries. We will discuss their testimony as relevant below.

In its final order, entered on January 27, 2025, the trial court concluded that the Holdings did not breach the easement or unreasonably interfere with Ms. Sappo's right to use the easement and did not abandon its rights in the easement. Further, the court determined that Ms. Sappo had not committed trespass. The court determined the scope of the JDA to be, in pertinent part, as follows:

- The width of the Easement is eight (8) feet from the beginning point as set forth in the Easement until the end of the concrete driveway at the top at the rear of the homes;
- From the end of the concrete driveway at the top at the rear of the homes, the width of the Easement extends to the patio/retaining wall with the same corresponding length extending from the common boundary line onto the 409 Property;

- The length of the Easement starts from the beginning point as set forth in the Easement until 72 inches beyond the end of the concrete driveway at the top at the rear of the homes;
- The Easement creates mutual repair obligations for the owners of the Properties. . . ;
- As a joint driveway, the permissible uses of the Easement are limited to ingress, egress, both vehicular and pedestrian, and maintenance. . .

The trial court ordered the parties to obtain and record a survey of the easement dimensions in accordance with the court's specifications.

Ms. Sappo has appealed the trial court's decision and presents a number of issues for our review, which we restate as follows: (1) whether the trial court erred in failing to define the easement in accordance with the express language of the JDA and the property owners' intent; (2) whether the evidence preponderates against the trial court's finding that the Holdings did not unreasonably interfere with Ms. Sappo's rights under the easement; (3) whether the evidence preponderates against the trial court's finding that the Holdings had not abandoned the easement; (4) whether the trial court abused its discretion in awarding discretionary costs to the Holdings; and (5) whether the trial court erred in failing to award compensatory and punitive damages to Ms. Sappo.[1]

STANDARD OF REVIEW

In an appeal from a bench trial, we review a trial court's factual findings de novo on the record with a presumption of correctness, unless the preponderance of the evidence indicates otherwise. TENN. R. APP. P. 13(d); *Lovlace v. Copley*, 418 S.W.3d 1, 16 (Tenn. 2013). We review the trial court's determinations on questions of law de novo with no presumption of correctness. *Tenn. Homes v. Welch*, 664 S.W.3d 1, 8 (Tenn. Ct. App. 2022). Appellate courts afford "considerable deference" to factual findings by a trial court based on witness credibility and will not reverse a trial court's "credibility-based factual findings" unless there is clear and convincing evidence otherwise. *Easley v. City of Memphis*, 699 S.W.3d 268, 270 (Tenn. 2024).

A trial court's decision on discretionary costs is within the trial court's discretion. *Mitchell v. Jackson Clinic, P.A.*, 420 S.W.3d 1, 12 (Tenn. Ct. App. 2013). An abuse of discretion occurs when a court "'causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence.'"

---

[1] In her statement of the issues, Ms. Sappo listed as an issue whether the trial court erred in denying her motion for sanctions against the Holdings for spoliation of evidence. Ms. Sappo's brief does not, however, contain any argument on this issue. Therefore, we consider the issue waived.

*Harmon v. Hickman Cmty. Healthcare Servs., Inc.*, 594 S.W.3d 297, 305 (Tenn. 2020) (quoting *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010) (citations omitted)).

ANALYSIS

I.      Construction of joint driveway agreement ("JDA")

Ms. Sappo asserts that the trial court erred in considering extrinsic evidence and that, even if the JDA contains a latent ambiguity, the extrinsic evidence surrounding the circumstances at the time of the creation of the easement in 1960 supports her position—namely, that the easement extends from 32nd Avenue to the rear of the properties with a width measured by the entire space between the two houses (approximately 13 feet). For the reasons discussed below, we have determined that the evidence does not preponderate against the trial court's factual determinations, which support the trial court's interpretation of the JDA.

"An easement is an interest in property that confers on its holder a legally enforceable right to use another's property for a specific purpose." *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998). The owner of the easement has the dominant estate, and the owner of the underlying property has the servient estate. *Rogers v. Roach*, No. M2011-00794-COA-R3-CV, 2012 WL 2337616, at *8 (Tenn. Ct. App. June 19, 2012). When construing an instrument creating an easement, a court must "'ascertain and give effect to the intention of the parties.'" *Burchfiel v. Gatlinburg Airport Auth.*, No. E2005-02023-COA-R3-CV, 2006 WL 3421282, at *3 (Tenn. Ct. App. Nov. 28, 2006) (quoting 28A C.J.S. *Easements* § 57 (1996)). The language of the instrument creating the easement determines the parties' intention as to an easement's purpose and scope, and "'the easement holder's use of the easement must be confined to the purpose stated in the grant of the easement.'" *Id.* (quoting *Columbia Gulf Transmission Co. v. Governors Club Prop. Owners Ass'n*, No. M2005-01193-COA-R3-CV, 2006 WL 2449909, at *3 (Tenn. Ct. App. Aug. 21, 2006)). When a court construes the language of an express easement, "'the words expressing the party's intention should be given the usual, natural and ordinary meaning.'" *Shew v. Bawgus*, 227 S.W.3d 569, 576 (Tenn. Ct. App. 2007) (quoting *Cellco P'ship v. Shelby Cnty.*, 172 S.W.3d 574, 587 (Tenn. Ct. App. 2005)). Courts customarily do not consider parol evidence to add to, vary, or contradict the language of the written instrument. *Mitchell v. Chance*, 149 S.W.3d 40, 44 (Tenn. Ct. App. 2004). Parol evidence may, however, "be admissible to remove a latent ambiguity" in the instrument. *Id.*

The parties in this case agree that the JDA created an express easement appurtenant. An express easement is an easement created by a written instrument, and an easement appurtenant "'benefit[s] another tract of land, the use of [the] easement being incident to the ownership of that other tract.'" *Holder v. Serodino*, No. M2014-00533-COA-R3-CV, 2015 WL 5458377, at *8 (Tenn. Ct. App. Sept. 16, 2015) (quoting BLACK'S LAW DICTIONARY 586 (9th ed. 2009)). With an easement appurtenant, "[t]he tract benefitted is

deemed the dominant estate, and tract burdened by the easement is deemed the servient estate." *Id.* Easements appurtenant "'run with the land,'" so the rights automatically pass upon transfer of the land. *Id.* (quoting *Newman v. Woodard*, 288 S.W.3d 862, 865 (Tenn. Ct. App. 2008)). The JDA created reciprocal rights in the owners of the adjoining properties, so "their property interests are as both dominant and servient tenement holders subject to the other's easement rights." *Id.*

A. Propriety of considering extrinsic evidence

Ms. Sappo argues that the trial court erred in considering extrinsic evidence because there is no ambiguity regarding the contours of the easement. We cannot agree.

The key language of the JDA provides that "said joint driveway as now located along the common dividing line between their respective properties is hereby agreed to be used as a joint driveway for the use and benefit of their respective properties." In an earlier paragraph, the JDA states that the driveway "runs back along the common dividing line between each of the properties." The trial court found as follows:

> [T]he description of the Easement is unclear, as it does not discuss the width and length of the easement. Both parties' surveyors testified that they could not draw in the easement onto their respective surveys due to the lack of detail. Although the Easement provided the starting point, it did not discuss the remaining dimensions. Thus, the Court must look to extrinsic evidence to determine the intention of the parties.

Ms. Sappo interprets the language of the JDA to mean that the driveway (and the easement) are coextensive with the entire length of the property line. While acknowledging that the JDA "does not include an end point" for the easement, Ms. Sappo asserts that "[t]he lack of a specific width or length of the easement indicates that the owners did not intend to limit the dimensions of the width or length and intended the broadest extent possible for the dimensions of the shared driveway between and behind their houses." Further, she argues, "The only reasonable interpretation of the plain language means that the Easement continues from 32nd Avenue along the full length of the common property line."

The existence and nature of the easement in this case are not in dispute. The issue is the precise location and extent of the easement. This Court has previously observed that "instruments lacking 'an easement's location or dimensions are commonplace.'" *Id.* (quoting *Mitchell,* 149 S.W.3d at 45–46). In these circumstances, where the instrument creating an easement lacks a precise description of the easement's dimensions, the courts "may consider extrinsic evidence of the parties' intent to determine the easement's location." *Id.* at *9 (citing *Mitchell,* 149 S.W.3d at 46).

The JDA provides a clear starting point for the easement: the place where the driveway touches 32nd Avenue South. As to the easement's length and width, the JDA states only that the parties will continue to share a joint driveway that "runs back along" the property line. Ms. Sappo's expert surveyor, Danny Wamble, opined that, "with this legal description in this joint agreement, there is not enough evidence to give me the dimensions to be able to put the title line on the ground." Even after looking at adjoining deeds and other title information, Mr. Wamble could not determine the exact location of the easement. The Holdings' expert surveyor, Mark Donlon, also could not identify the dimensions of the easement. We agree with the trial court that the plain language of the easement is unclear as to the length and width of the easement. We conclude that the trial court properly considered extrinsic evidence in order to determine the length and width of the easement.

## B. The trial court's findings regarding the extrinsic evidence

Next, Ms. Sappo argues that the evidence preponderates against the trial court's findings regarding the intent of the parties as to the location and scope of the easement.

Where the meaning of an instrument creating an easement is

> "doubtful, the rights of the parties are to be determined by the rule of reason rather than by some technical rule of property law, and in such a case the court may consider the surrounding circumstances at the time the instrument was executed, the situation of the parties, and any practical construction of the instrument given by the parties themselves in determining their intention."

*Cellco P'ship*, 172 S.W.3d at 595 (quoting 28A C.J.S. *Easements* § 146 (1996)). A court may take into account "(1) the purpose of the easement, (2) the geographic relationship between the dominant and the servient tenements, (3) the use of each of the tenements, (4) the benefit to the easement holder compared to the burden on the servient tenement owner, (5) the admissions of the parties, and (6) the use existing at the time of the easement's creation." *Mitchell*, 149 S.W.3d at 46. Moreover, where the dimensions of an easement are "'not specifically defined, it need be only such as is reasonably necessary and convenient for the purpose for which it was created.'" *Shew*, 227 S.W.3d at 577 (quoting *Burchfiel*, 2006 WL 3421282, at *3).

In reaching its decision regarding the location of the easement, the trial court stated, in part:

> There is strong evidence that the intent of the original grantors was for the easement holders to have the right to use the joint driveway to gain access to the back of the houses, and, more specifically, to the garages located

behind the Properties. The sole witness with any knowledge of the Properties at the time of the creation of the Easement was Randy Hunt, the child of the owners of the 407 Property who executed the Easement. He testified that his parents did not use the garage for parking during that period, and that the owners of the 409 Property sometimes parked in the garage on that property, while other times they parked behind the house. Hunt testified that the driveway at the time was part concrete and part grass and rock mixture. Further, that the garages were "off the drive just a little bit," indicating that the garages were not straight back off the driveway. Also, that neither property owner parked on the driveway so that it was not blocked.

Moreover, Chris Hayes testified that there was a concrete driveway that turned into a gravel, dirt, and grass mixture between the houses. During the time he lived there, the garages had been removed and there was an asphalt parking area behind the 407 Property. Further, that the garage foundation was not straight back from the driveway and that you had to "veer a little bit to get back there." Also, he was instructed not to park in the driveway.

Accordingly, based on the foregoing testimony, the existence and location of the garages, and the existence and location of the tree and metal pole, it is clear that the parties intended to use the joint driveway to access their respective properties by veering to the left or right at the end of the concrete driveway which terminated at the rear of the houses, and not to drive straight back along the common boundary line. Accordingly, the Court declines to grant Plaintiff's request that the Easement runs along the shared boundary line up to the front of the former location of the garages, as the Court does not find that is consistent with the testimony or evidence presented as to the use of the Easement. Instead, occupants of the respective Properties would turn at the termination of the concrete driveway; otherwise, they would hit the tree and metal pole. The Court further declines to grant Plaintiff's request that the Easement is the width between the houses, or over 13-feet wide. That would also be inconsistent with the use and intention of the original parties. The testimony evidences that the owners and occupants of the respective Properties cared and maintained for their respective strips on either side of the concrete driveway, and that this portion was not used for vehicular ingress or egress. Accordingly, the Court finds that the width of the Easement is eight feet, the width of the concrete driveway as testified to by the parties' surveyors. The evidence presented indicates that this dimension is in line with the principles for interpreting easements as it is "reasonably necessary and convenient for [the] purpose for which it was created." *Shew*, 227 S.W.3d at 577.

Ms. Sappo takes the position that the trial court improperly focused upon the use of the easement since 1960 instead of upon the circumstances and intent of the parties at the time of the easement's creation in 1960. We disagree. The trial court examined the circumstances surrounding the creation of the easement as well as "the use of [the] easement commenced after its execution and to which the owner of the servient tenement acquiesces," which "can also provide persuasive evidence of the intended location of the easement." *Mitchell*, 149 S.W.3d at 46.

One important circumstance at the time of the easement's creation was the triangle exchange, which occurred just days before the JDA. Ms. Sappo does not explain how this land swap supports her position that the easement was intended to allow the parties "to use the open area in the rear of the Properties for vehicle access." Mr. Wamble, Ms. Sappo's surveyor, testified as follows concerning the effect of the triangle exchange:

> Q. [Referring to the period prior to the triangle exchange] And so . . . if the car that belonged to 409 were to come up the driveway and park in the garage, they would be on the property of their neighbor while they're parked in the garage?
> A. Correct.
> Q. And so by exchanging these two triangular properties—and the same is true of 407 when it started going up the driveway, it's driving on its neighbor's property?
> A. Correct.
> Q. So by exchanging these two, you have resolved those two issues. Now, each party has fee simple to those areas, correct?
> A. Correct.
> Q. And what remains is this area kind of in between the triangles where you can't get through between the two houses without using other properties, correct?
> A. Correct.
> Q. And in your opinion – I mean, there's no way to solve that in this particular situation for both properties to be able to use the driveway. You are ultimately going to be left with an easement to some extent because of the nature of the boundaries?
> A. Correct. Because the boundary line, the common boundary line now goes up, generally up the center of the driveway.

The Chandlers (409) obtained title to their backyard and garage through the triangle exchange. As a result, as the Holdings point out, the Chandlers now had full access to their backyard, and "there would be no reason to create more limited easement rights over those same areas just days later." The JDA addressed the remaining problem—the "chokepoint" between the two houses, over which both properties desired access rights.

Randy Hunt was the only witness who had direct knowledge of the condition of the two properties in 1960. He was born in 1953 and lived with his parents at 407 from approximately 1955 through 1973. His parents owned the property for 46 years, so Mr. Hunt would also visit there after he grew up and moved away. Mr. Hunt testified that the Hunts did not park in their garage; they parked off of the side street, Marlborough, on the right side of the house. According to Mr. Hunt, the driveway between the two houses was partly concrete "in a straight line" and partly grass. When a person reached the area behind the houses, the surface "would have been just grass and just rock mixture." His parents sometimes drove on the driveway and would "sometimes go around the circle" from the Marlborough side, behind the house, and down the driveway to 32nd.

Mr. Hunt stated that the Chandlers used the driveway and sometimes parked their car in the garage. He recalled that the Chandlers "usually would . . . come up the drive, make the left-hand turn and park there [behind the house] and go in their house." He further testified that later 409 occupants would make the same left-hand turn and park behind the house. He also explained that, "Then what they'd do, instead of backing down the driveway, they would just back up to the garage and then pull straight down." Contrary to Ms. Sappo's argument, we do not see the fact that 409 occupants would sometimes use the area in front of the garage to back up and then drive out of the driveway as an indication of the parties' intention "to grant each other the right to freely use the open space in the rear of the Properties along the new common boundary line, without regard to precise dimensions." Rather, because the extent of the easement is not well-defined, the trial court correctly determined the area "reasonably necessary and convenient" to the purposes of the easement. Even if that purpose included access to the garages, use of the other's property was not necessary.

Ms. Sappo also argues that the evidence "does not support that a tree or metal pole impacted the historic use of the driveway or Easement." She points to the absence of any mention of the metal pole or tree in the testimony of Mr. Hunt or three other witnesses. We agree with Ms. Sappo that the evidence does not establish when the tree or the metal pole was first installed in the yard. But, as previously stated, evidence of subsequent owners' use of the easement may be considered by the court as persuasive evidence regarding the parties' intentions. *Mitchell*, 149 S.W.3d at 46. The expert testimony and surveys showed that a metal pole and a tree were near the property line behind the houses for a significant period of time and were removed after the parties moved into the properties in 2021.

The evidence does not preponderate against the trial court's findings that the parties' intent was for the easement to be used to navigate the area between the two houses and that it included enough additional ground (beyond the original concrete portion) to allow a car to turn left or right onto their own property. The fact that the owners of 407 installed a retaining wall in 2019 that prevented them from driving onto their own backyard is not inconsistent with the trial court's findings.

Furthermore, even without the trial court's determination regarding the intent of the parties, the court's determination is supported by the "use of the way." Ms. Sappo asserts that the trial court's application of the use-of-the-way analysis was "misplaced." In *Shew v. Bawgus*, 227 S.W.3d at 569, the issue before the court was the width of an easement referenced in multiple deeds. The initial deed in 1932 stated that, "The party of the first part reserves the right of outlet over said property." *Id.* at 571. Over the years, the dominant and servient estates were divided and conveyed to other parties. *Id.* A driveway within the easement was created in the 1950s, *Id.* at 577, and one of the subsequent deeds referenced a "perpetual easement or right-of-way over and across the existing joint driveway and right-of-way (30 feet in width)." *Id.* at 571. The trial court determined that the easement over the defendants' property was 30 feet wide. *Id.* at 575.

In reversing the trial court's decision regarding the width of the easement, the *Shew* court quoted with approval the following language:

> "If the location of an easement cannot be ascertained by the language of the instrument or the surrounding circumstances, the use of the way fixes the location. *See Hill v. U.S. Life Title Ins. Co. of N.Y.*, 731 S.W.2d 910, 913 (Tenn .Ct. App. 1986) ("If a right of way is decreed over the lands of another, it is not necessary for the parties expressly to designate its location, but it is sufficient if a right-of-way is used and acquiesced in. The use fixes the location.") (quoting *Richardson v. Bristol Land & Improvement Co.*, 1 Tenn. App. 671, 690 (1929))."

*Id.* at 577 (quoting *Fanning v. Wallen*, No. E2001-00228-COA-R3-CV, 2001 WL 950001, at *6 (Tenn. Ct. App. Aug. 21, 2001)). The court found that the driveway within the easement had not changed since 1950 and "has been used for all of these years for ingress and egress, or outlet, as originally intended pursuant to the plain language of the deed." *Id.* Because the driveway had been "used pursuant to the purpose for which it was created and its width has not changed in over fifty years, 'the use of the way fixes the location.'" *Id.* (quoting *Fanning*, 2001 WL 950001, at *6). This Court determined that widening the easement to 30 feet in width "would materially increase the burden upon the Servient Estate and cause an undue burden." *Id.* at 578.

In the present case, as in *Shew*, the instrument creating the easement does not specify its parameters. As previously discussed, there is evidence of the intention of the parties at the time of the easement's creation. The record also contains evidence of the various property owners' use of the easement over the subsequent 65 years. Thus, even without conclusive evidence from the circumstances surrounding the creation of the easement, the use of the way would support the trial court's ruling.[2]

---

[2] As part of her argument concerning the location of the easement, Ms. Sappo objects to the following finding by the trial court:

II.     Unreasonable interference with the easement

The trial court rejected Ms. Sappo's claim that the Holdings had unreasonably interfered with her full usage of the easement by erecting a retaining wall, irrigation and electrical lines, and landscaping. On appeal, Ms. Sappo argues that the evidence preponderates against this finding.

To prevail on her claim for unreasonable interference, Ms. Sappo (the dominant landowner in this scenario) had the burden of proving that the Holdings (the servient landowner) unreasonably interfered with her use of the easement and caused actual damage to her. *See Shell v. Williams*, No. M2013-00711-COA-R3-CV, 2014 WL 118376, at *9 (Tenn. Ct. App. Jan. 14, 2014). The owner of the servient estate "may use his property in any manner consistent with the existence of the easement," but cannot "make any alterations in his property by which the enjoyment of the easement will be materially interfered with." *Keenan v. Fodor*, Nos. M2012-00330-COA-R3-CV, M2012-02623-COA-R3-CV, 2014 WL 793713, at *7 (Tenn. Ct. App. Feb. 26, 2014). Thus, the question is: "'[W]hether, under the specific facts presented, the [obstruction] is necessary to the use and enjoyment of the landowner's land and whether it does not unreasonably interfere with the easement holder's use of the right of way.'" *Shell*, 2014 WL 118376, at *10 (quoting *Roach*, 2012 WL 2337616, at *9). Determining whether a particular type of interference is reasonable "requires consideration of all the circumstances, including the purpose and reasonable use of the easement and the landowners' reasons for installing [the improvement]." *Roach*, 2012 WL 2337616, at *11.

The trial court determined that Ms. Sappo did not meet her burden of proof that the alleged encroachments unreasonably interfered with "any legitimate use of the Easement." In reaching this conclusion, the court stated:

Further, the Court finds that Plaintiff has hindered her ability to use the Easement by adding rocks and grass to her side of the Easement where the drainage pipe was installed. The Court does not find it reasonable to burden Defendant's property when Plaintiff has taken action which narrows her space to navigate ingress and egress of her property from the concrete driveway, especially when the drainage pipe could be fixed for a minimal amount.

Ms. Sappo asserts that, "Although she can reach the rear of 409 with her compact vehicle, White's retaining wall damages her vehicle while she uses the driveway." She argues that the trial court deviated from the appropriate analysis for discernment of the original grantors' intent regarding the location of the easement because the court considered the current use of one property owner but not that of the other. As discussed in the next section of the opinion, the trial court did not give credence to Ms. Sappo's allegations about the effect of the retaining wall on the 407 property. As previously discussed, the trial court properly based its decision concerning the location of the easement primarily on the intent of the original parties to the JDA, as informed by the historical evidence of the use of the easement over the succeeding years. The court's finding regarding Ms. Sappo's current burdening of the easement do not conflict with the trial court's determination concerning the boundaries of the easement.

- 15 -

Although the court finds that the Easement width is eight feet based upon the width of the concrete driveway, the evidence in the record does not demonstrate that Plaintiff was prevented from accessing the rear of her property as a result of the placement of the patio and retaining wall, irrigation and electrical lines, front fence, the arborvitae shrub, and/or the ornamental grasses along the front fence. In fact, the videos in the record show Plaintiff using the Easement and accessing the rear of the 409 Property without issue despite the presence of the purported encroachments. What the videos do show, however, is that the Plaintiff's narrowing of her side where the drainage pipe is located forces her to veer more towards the 407 Property. Further, neither Plaintiff nor her mother raised the issues of these encroachments with Defendant until at least the August meeting prior to initiating the suit. None of the texts reveal that either Plaintiff or her mother hit the retaining wall, and the Court finds credible Mr. Helman's testimony that the first time the retaining wall was raised was at the final meeting in August and that the issue of hitting the retaining wall was not discussed. Moreover, the retaining wall/patio was installed in 2019 and Mr. White testified that it was in the same footprint as the asphalt parking area that had been there previously. Further, Chris Hayes testified that the asphalt parking area had a lip or curb that was difficult to navigate, which indicates that occupants of the 409 Property would need to turn left upon the termination of the concrete driveway. None of the occupants of the 409 Property testified that they had issues accessing the rear of that property. Accordingly, the Court does not find that Plaintiff has met her burden of demonstrating that the patio/retaining wall, the electrical/irrigation lines, and/or the arborvitae unreasonably interfere with her ability to use the Easement.

Likewise, the Court does not find the front fence and the ornamental grasses unreasonably interfere with Plaintiff's use of the Easement. The metal fence replaced a prior wooden fence that had been in place for many years without any issues regarding the use of the Easement. Further, the Court does not find the ornamental grasses unreasonably interfere with Plaintiff's use of the Easement, as it does not prevent Plaintiff from utilizing the concrete driveway for ingress and egress. Moreover, Clark Helman testified that he maintains the ornamental grasses. Accordingly, the Court does not find any encroachments identified by Plaintiff unreasonably interfere with her rights under the Easement.

(Citations to record omitted).

On appeal, Ms. Sappo argues that she "established that the retaining wall (and its irrigation and low voltage lines), the arborvitae, the fence, and ornamental grasses all lie

- 16 -

within the Easement." Ms. Sappo specifically references testimony by Mr. Wamble, her expert surveyor, stating that the fence encroached by two feet, the ornamental grass by three feet, and the retaining wall by four feet into the easement. These statements were preceded, however, by the qualifier, "So if it was determined that title [to the easement] was from house to house for the driveway agreement." Ms. Sappo's argument assumes that the trial court erred in its determination regarding the location of the easement, and we have already addressed that issue.

Under the easement boundaries as determined by the trial court, these encroachments, with the possible exception of the ornamental grasses, do not lie within the easement. To the extent that the ornamental grasses along the driveway could encroach upon the driveway itself, the trial court found that the encroachment did not unreasonably interfere with Ms. Sappo's use of the easement, and Ms. Sappo has not identified any way in which the evidence preponderates against that finding.

Ms. Sappo also emphasizes that she and her mother were the only witnesses with firsthand knowledge of "navigating a vehicle up the driveway in its current condition." As the Holdings points out, Chad Hollingsworth, who owned 409 prior to Ms. Sappo (and during the time after the patio and retaining wall were erected on the 407 property), testified that nothing on the 407 property ever prevented him from driving into his backyard. Moreover, the trial court heard the testimony of Ms. Sappo and Ms. Fusco and, as reflected in its findings, did not give that testimony much weight. In assessing the credibility of their testimony concerning the effect of the alleged encroachments, the trial court relied upon the video evidence as well as its findings that neither raised any issue about the encroachments until almost 2.5 years after purchasing the property.[3]

Overall, we conclude that the evidence does not preponderate against the trial court's determination that the encroachments asserted by Ms. Sappo did not unreasonably interfere with her use of the easement.

III.     Abandonment of the easement

Ms. Sappo also contends that the trial court erred in rejecting her alternative claim that the Holdings abandoned the easement. We agree with the trial court's determination.

A party asserting abandonment of an easement must prove by clear and convincing evidence both "'an intention to abandon the easement [and] also external acts carrying that

---

[3] Ms. Sappo criticizes the trial court's reliance on "two findings that have no logical connection to the question of unreasonable interference"—the fact that White installed the retaining wall and patio in 2019 on the pre-existing asphalt footprint, and Mr. Hayes's testimony about the asphalt on the 407 property having a lip or curb. The trial court's mention of these findings reaffirms its conclusions concerning the historical use of the shared driveway, ending shortly after the end of the concrete portion, where the owners on either side turned onto their own property.

intention into effect.'" *Coolidge v. Keene*, 614 S.W.3d 106, 116 (Tenn. Ct. App. 2020) (quoting *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998)). Clear and convincing evidence requires "'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Id.* (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Nonuse of the easement alone is not sufficient to prove abandonment. *Id.* Rather, nonuse must be combined with "'proof that the easement holder or holders intended to abandon the easement.'" *Id.* (quoting *Hall*, 984 S.W.2d at 620-21)). Factors that may be considered by courts on the issue of whether an easement has been abandoned include:

> "(1) statements by the easement holder acknowledging the easement's existence and disavowing its use, (2) the easement holder's failure to maintain the easement in a condition permitting it to be used for access, (3) the easement holder's acquiescence in the acts of others that reduce the utility of the easement, (4) the easement holder's placement of a permanent obstruction across the easement, or (5) the easement holder's development of alternative access in lieu of the easement."

*Id.* (quoting *Hall*, 984 S.W.2d at 621).

In concluding that there was no merit to Ms. Sappo's abandonment claim, the trial court made the following findings:

> While the 407 Property owners park on the Marlborough side of their home and no longer use the Easement for vehicular ingress or egress to their property, the proof does not demonstrate that any of the 407 Property owners intended to abandon their rights under the Easement. Mr. White and Mr. Helman both expressed they did not intend to abandon their right and the conversations between Mr. Helman and Plaintiff demonstrate that she was aware of his rights under the Easement.

Ms. Sappo focuses her argument on the fact that the retaining wall and patio block vehicular access to the back of the 407 property. However, as previously stated, mere nonuse is not enough to prove abandonment. There must be clear and convincing evidence of an intent to abandon the easement. Both Mr. White and Eric Helman denied any intent to abandon the easement. Moreover, the evidence showed that 407 residents used the driveway for pedestrian access as well as for maintenance purposes. The easement was listed in the deeds transferring the property, even after the patio and wall were installed. Ms. Sappo did not present clear and convincing evidence of an intent to abandon the easement.

In light of our conclusions regarding the trial court's rulings on Ms. Sappo's claims, we need not address her argument regarding her entitlement to compensatory or punitive damages.

- 18 -

IV. Discretionary costs

Finally, Ms. Sappo argues that the trial court abused its discretion in awarding discretionary costs to the Holdings.

When a party prevails at trial, he or she may request an award of discretionary costs. *Freeman v. CSX Transp., Inc.*, 359 S.W.3d 171, 179 (Tenn. Ct. App. 2010). Tennessee Rule of Civil Procedure 54.04(2) defines discretionary costs as "reasonable and necessary court reporter expenses for depositions or trials, reasonable and necessary expert witness fees for depositions (or stipulated reports) and for trials, reasonable and necessary interpreter fees not paid pursuant to Tennessee Supreme Court Rule 42, and guardian ad litem fees." Courts award discretionary costs "to make the prevailing party whole," rather than "to punish the losing party." *Owens v. Owens*, 241 S.W.3d 478, 497 (Tenn. Ct. App. 2007).

The party seeking discretionary costs bears the burden of proving to the trial court that he or she is entitled to them. *Freeman*, 359 S.W.3d at 179. Generally, courts should "award discretionary costs to a prevailing party if the costs are reasonable and necessary and if the prevailing party has filed a timely and properly supported motion." *Mass. Mut. Life Ins. Co. v. Jefferson,* 104 S.W.3d 13, 35 (Tenn. Ct. App. 2002). When deciding whether to award discretionary costs pursuant to Rule 54.04(2), a trial court should:

> (1) determine whether the party requesting the costs is the "prevailing party," (2) limit awards to the costs specifically identified in the rule, (3) determine whether the requested costs are necessary and reasonable, and (4) determine whether the prevailing party has engaged in conduct during the litigation that warrants depriving it of the discretionary costs to which it might otherwise be entitled.

*Id.* at 35-36 (footnotes omitted).

In this case, the Holdings filed a motion seeking discretionary costs in the total amount of $24,897.46. Ms. Sappo opposed the motion. The trial court heard the matter in March 2025 and entered an order on April 14, 2025, granting in part and denying in part the motion for discretionary costs. The trial court awarded the Holdings $21,197.46 in discretionary costs. On appeal, Ms. Sappo's chief argument is that the trial court erred in determining that the Holdings was the prevailing party; she also asserts that the trial court erred in including in its award of discretionary costs the expenses associated with the depositions of Ms. Sappo's experts.

As our Supreme Court has stated, "The 'prevailing party' determination is necessarily fact-intensive." *Fannon v. City of LaFollette*, 329 S.W.3d 418, 432 (Tenn. 2010). One need not "attain complete success on the merits of a lawsuit in order to prevail."

*Id.* at 431. Instead, "a prevailing party is one who has succeeded 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).

In its order on discretionary costs, the trial court analyzed the issue of who was the prevailing party, reviewing its holdings in the final order that: "Defendant did not breach the easement agreement or unreasonably interfere with Plaintiff's right to use the easement, (2) Plaintiff was not entitled to any damages, (3) Defendant did not abandon its rights to the easement, and (4) Plaintiff did not trespass upon Defendant's property." In declaring the boundaries of the easement, the court stated, it had "partially adopt[ed] Defendant's recommendation." The court concluded that: "The practical effect of these holdings is that Plaintiff did not obtain the relief she requested because Defendant defeated most of Plaintiff's claims."

The trial court further reasoned:

[Plaintiff] requested relief in the form of a declaration that the easement extend to the former location of the garage as well as extend the width between the two houses. While Plaintiff obtained some relief, such as use of the easement beyond the physical footprint of the concrete driveway and unimpaired use of the property within the easement's boundary, she asserted strong positions that were ultimately unsuccessful. Relevant to the equities of the case is the Court's finding at trial that Plaintiff, prior to filing suit, installed drainage pipes that narrowed the drivable area on her side of the driveway. Based on the relief granted by the Court after the trial and the particular equities of the case, the Court finds that Defendant is the prevailing party.

In asserting that the Holdings was not the prevailing party, Ms. Sappo emphasizes the fact that the trial court extended the easement beyond the concrete portion of the driveway and granted preliminary injunctive relief to her to require the Holdings to remove the concrete blocks placed in the driveway. She also points out that the judgment did not award damages to either party and required both parties to be responsible for maintaining the driveway and for obtaining a survey of the easement. Yet, as the trial court concluded, the overall impact of the court's ruling was that the Holdings defeated most of Ms. Sappo's claims. We find no error in the trial court's determination that the Holdings was the prevailing party.

Ms. Sappo also asserts that the trial court erred in requiring her to pay the invoices for the depositions of her two expert witnesses. She relies upon Tenn. R. Civ. P. 26.04(4)(C) and argues that, under this rule, the Holdings was required to pay the cost of deposing her experts. The pertinent language states that, in the absence of manifest injustice, "the court shall require that the party seeking discovery pay the expert a

reasonable fee for time spent in responding to discovery under subdivisions (4)(A)(ii) and (4)(B) of this rule." TENN. R. CIV. P. 26.04(4)(C)(i). The Holdings asserts that this rule applies to the payment of expert fees during the discovery phase of the litigation and does not preclude those fees from being included in an award of discretionary costs. Tennessee Rule of Civil Procedure 54.04(2) provides that allowable discretionary costs include "reasonable and necessary expert witness fees for depositions."

Ms. Sappo does not argue that the deposition fees incurred by the Holdings to depose her expert witnesses were not reasonable and necessary; she argues only that such fees "should not be permitted as discretionary costs under Rule 54.04." She cites no caselaw to support this position. Cases interpreting Rule 54.04(2) have noted that the rule covers expert witness fees for depositions but not an expert's fees for preparing for depositions. *See Jefferson*, 104 S.W.3d at 38. We find no abuse of discretion in the trial court's decision to include these expert deposition fees in its award of discretionary costs.

CONCLUSION

The judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, Charlotte R. Sappo, for which execution may issue if necessary.

/s/ Andy D. Bennett
ANDY D. BENNETT, JUDGE

- 21 -